942 F.2d 712
 Oliver J. FOUST, Plaintiff-Appellant,
v.
Manuel LUJAN, Jr., Secretary of the Interior, Defendant-Appellee,
Northern Arapaho and Shoshone Indian Tribes of the Wind
River Indian Reservation, Defendants/intervenors-Appellees.
 No. 90-8004.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 14, 1991.
Rehearing Denied Oct. 24, 1991.
 
 John R. Hursh (Maureen T. Donohoue with him on the briefs) of Hursh & Donohoue, Riverton, Wyo., for plaintiff-appellant.
 Andrew C. Mergen, Atty., Dept. of Justice, Environment and Natural Resources Div., Washington, D.C. (Richard B. Stewart, Asst. Atty. Gen., Richard A. Stacey, U.S. Atty., and David A. Kubichek, Asst. U.S. Atty., Cheyenne, Wyo., Robert L. Klarquist, Atty. Dept. of Justice, Environment and Natural Resources Div., Washington, D.C., with him on the brief), for defendant-appellee.
 Robert S. Thompson, III (Sandra Hansen, also of Whiteing & Thompson, Boulder, Colo., Susan M. Williams of Gover, Stetson, Williams & West, Albuquerque, N.M., with him on the brief), for defendants-intervenors-appellees.
 Before McKAY, SETH and LOGAN, Circuit Judges.
 LOGAN, Circuit Judge.
 
 
 1
 Plaintiff Oliver Foust applied, pursuant to § 316 of the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1746, to correct an error in a land patent issued by the United States to Byron Smith, his predecessor in title. The Bureau of Land Management (BLM) approved Foust's application, and intervenors-defendants the Northern Arapaho and Shoshone Indian Tribes (Indians) appealed. The Interior Board of Land Appeals (IBLA) reversed the BLM's decision, and the district court upheld the reversal. Foust now appeals.
 
 
 2
 The land at issue is within Section 28, T. 6N., R. 6E., Wind River Meridian, Wyoming, which was part of a federal reserved water power site at the time the United States issued the patent to Smith. In 1929 and 1930, Smith filed homestead entry applications for the NE 1/4SE 1/4 and lots 4 and 5. His applications were denied initially but then granted after he appealed. In 1935, Smith filed a final proof for his entries onto these three lots, listing his improvements as follows: a house, double garage and other buildings on the NE 1/4SE 1/4; a house, garage, and cellar on lot 4; and a fenced garden on lot 5. In 1936, the United States issued to Smith patents for the NE 1/4SE 1/4 and lots 4 and 5.
 
 
 3
 In 1942, the United States restored all undisposed land within Section 28, T. 6N., R. 6E., to the ownership of the Northern Arapaho and Shoshone Indian Tribes of the Wind River Reservation. In 1963, Smith's widow conveyed the NE 1/4SE 1/4 and lots 4 and 5 to Foust by warranty deed. A 1979 resurvey of the area showed that the buildings that Smith had built and indicated as being on the NE 1/4SE 1/4 were, in actuality, located within the SW 1/4NE 1/4. Foust applied for a patent correction in 1982, ultimately proposing to deed back the NE 1/4SE 1/4 and lot 5 to the United States in exchange for roughly equal acreage on which the buildings are actually located. The Indians, who have title to the SW 1/4NE 1/4, filed an action in the district court to nullify the patents, which was dismissed without prejudice to enable the patent correction proceedings to continue.
 
 
 4
 Foust argues that because of the difficulty in surveying the mountainous terrain and ascertaining lot boundaries, both the United States and Smith believed that the land on which Smith built was within the boundaries of the lots conveyed by the patents. Foust contends that this mutual mistake of fact can be corrected under 43 U.S.C. § 1746. The IBLA and the district court rejected Foust's arguments on several alternative grounds: 1) the land on which Smith built, SW 1/4NE 1/4, was not open to entry at the time the patents were issued and therefore cannot be subject to a patent correction under 43 U.S.C. § 1746; 2) Foust did not prove that a mistake of fact was made in granting him the NE 1/4SE 1/4 and lots 4 and 5; and 3) the equities of the case support a ruling for the Indians. See Shoshone and Arapahoe Tribes, 102 IBLA 256 (1988), I R. tab 1, Ex. B; Order Affirming Decision of the Interior Board of Land Appeals (D.Wyo. Nov. 13, 1989) (hereinafter "Order of Nov. 13, 1989"), I R. tab 33.
 
 
 5
 We review the IBLA's decision to determine if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or is "unsupported by substantial evidence...." 5 U.S.C. § 706(2)(A) & (E).
 
 
 6
 "Under the 'arbitrary and capricious' standard the scope of review is a narrow one. A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.' "
 
 
 7
 Bowman Transp. v. Arkansas-Best Freight Sys., 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823-24, 28 L.Ed.2d 136 (1971)). Under the "substantial evidence" test, our inquiry is whether the agency's decision is based on " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216-17, 83 L.Ed. 126 (1938)). This is something more than a mere scintilla but something less than the weight of the evidence. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); Consolo, 383 U.S. at 620, 86 S.Ct. at 1026-27. " 'The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.' " Bowman Transp., 419 U.S. at 284 n. 2, 95 S.Ct. at 441 n. 2 (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464-65, 95 L.Ed. 456 (1951)).
 
 
 8
 * We consider first whether 43 U.S.C. § 1746 permits a patent correction involving an exchange of the SW 1/4NE 1/4 for other lots to which Foust has title. The statute provides:
 
 
 9
 "The Secretary [of Interior] may correct patents or documents of conveyance ... relating to the disposal of public lands where necessary in order to eliminate errors. In addition, the Secretary may make corrections of errors in any documents of conveyance which have heretofore been issued by the Federal Government to dispose of public lands."
 
 
 10
 43 U.S.C. § 1746. The IBLA and the district court found that § 1746 does not allow what Foust proposes, because the SW 1/4NE 1/4 had been withdrawn from homestead entry for the purpose of a power reserve at the time the patents were issued. The district court acknowledged Foust's argument that Congress amended FLPMA in 1976 to remove language requiring that patent corrections be based on the land's availability for entry. Compare 43 U.S.C. § 697 (1964) with 43 U.S.C. § 1746 (1982). However, the court found the deletion of the entry language to be ambiguous and interpreted it to be "part of a concerted effort to simplify public land administration while retaining the basic precepts of public land law." Order of Nov. 13, 1989, at 18. We disagree.
 
 
 11
 The meaning of the congressional amendment deleting the entry language is clear: the statute no longer requires the land's availability for entry to correct a patent. We will not speculate as to what Congress might have intended, because no ambiguity exists. If Congress had intended something more subtle, it surely would have substituted language, rather than entirely deleting it. Furthermore, nothing in the legislative history supports the district court's analysis of congressional intent. See id. at 17-18 (legislative history fails to show why the entry language was deleted). A finding that the Secretary of Interior (Secretary) cannot correct a patent to include lands that were not subject to entry by the original patentee is not in accordance with the law.
 
 
 12
 We are similarly unpersuaded by the Indians' argument that the Secretary cannot correct a patent when doing so would require conveyance of tribal land. We agree that lands now held by the United States in trust for Indians are not public lands. See 43 U.S.C. § 1702(e). The relevant inquiry, however, is whether the lands in question were public lands at the time the patent was issued. The lot in question here, the SW 1/4NE 1/4, was owned by the United States, administered by the Secretary, and not held in trust for the Indians in 1936, and it therefore was public land under the statutory definition. See id.
 
 
 13
 We believe the Secretary's fiduciary duty to the Indians does not prevent him from correcting a patent to land that was public at the time the patent was issued and the alleged mistake made. If the responsible officers of the United States believed that the land on which Smith had built and claimed was the land described in the patent, and that the United States had already conveyed that land, the Congress could not have intended to restore that same land to the Indians in 1942. Thus, the Indians took the land subject to any mistaken description resulting from boundary uncertainties. The fact that the Secretary is vested with responsibilities both to correct patent errors and to act as trustee for the Indians cannot operate against patentees who have Indians, rather than non-Indians, as neighbors. We hold that the SW 1/4NE 1/4 is subject to the patent correction mechanism of 43 U.S.C. § 1746.
 
 II
 
 14
 The IBLA found, and the district court agreed, that Foust failed to prove that Smith's patent contained an error. Our inquiry is limited to whether this determination is supported by substantial evidence, 5 U.S.C. § 706(2)(E), in light of the entire administrative record, see Bowman Transp., 419 U.S. at 284 n. 2, 95 S.Ct. at 441 n. 2; Roberts v. Morton, 549 F.2d 158, 160 (10th Cir.1976), cert. denied, 434 U.S. 834, 98 S.Ct. 121, 54 L.Ed.2d 95 (1977). Errors in patents are defined as:
 
 
 15
 "the inclusion of erroneous descriptions, terms, conditions, covenants, reservations, provisions and names or the omission of requisite descriptions, terms, conditions, covenants, reservations, provisions and names either in their entirety or in part, in a patent or document of conveyance as a result of factual error. This term is limited to mistakes of fact and not of law."
 
 
 16
 43 C.F.R. § 1865.0-5(b). If both the United States and Smith intended that the land on which Smith built be conveyed to him but were mistaken about the boundaries or legal description, this would be a correctable mistake of fact.
 
 
 17
 Foust argues that the IBLA and district court ignored overwhelming evidence of this mutual mistake of fact. We agree. First, the topography of the area is such that ascertaining correct lot boundaries would have been difficult. Smith built in a small canyon among steep, rocky slopes and cliffs. It was not until 1979, when the area was resurveyed by modern surveying standards, that anyone was able to determine with certainty that the entry had been made on the SW 1/4NE 1/4, rather than the NE 1/4SE 1/4. Second, the SW 1/4NE 1/4 was the only place that was not too steep to build a house. This fact alone is not enough to convince us that the United States intended to convey the land on which Smith built, but it does raise questions about why Smith would have filed a homestead application, and why the United States would have issued a patent, for land that was too steep for a home.
 
 
 18
 Third, on several separate forms, Smith referred to the NE 1/4SE 1/4 but clearly described the SW 1/4NE 1/4. In his December 3, 1929, petition for designation of the NE 1/4SE 1/4 for stock-raising homestead entry, Smith described the lot as having "one small permanent spring," IIA R. Petition for Designation Stock-raising Homestead Law; the spring is located on the SW 1/4NE 1/4. In the testimony of claimant form, filed August 30, 1935, for his final proof, he stated that he had built a house, double garage, and other buildings on the NE 1/4SE 1/4. His non-water reserve affidavit, filed December 3, 1929, and his application for reduction of the required area of cultivation, dated September 11, 1935, referred to a spring being located on the NE 1/4SE 1/4.
 
 
 19
 Witnesses also mistakenly assumed that the land on which Smith built was the NE 1/4SE 1/4. His final proof of homestead included the affidavits of two witnesses, who stated that Smith had built a dwelling and garage on the NE 1/4SE 1/4. One affiant had been familiar with the land for seven years and had visited the Smith home about twenty-five times; the other had been familiar with the land for twenty years and had visited the Smith home at least four times per year. Foust also presented with his application for patent correction the affidavit of Bonnie Bleak, who has lived near the land in question since Smith entered and built on it. She attested to her good faith belief that the improvements were on the lands described in the patents.
 
 
 20
 Finally, and most significantly, the responsible officials of the United States erroneously believed that Smith had built on the NE 1/2SE 1/4. Because of a protest against Smith's entry, the General Land Office would not issue the patent until a special agent for the Department of Interior conducted a field investigation and determined that Smith had resided on the land he claimed he had entered. The special agent inspected the land and recommended granting Smith the patent to the NE 1/4SE 1/4 (as well as lots 4 and 5) because of his residence on the land. In his Favorable Report of November 18, 1935, the special agent described the NE 1/4SE 1/4 as "extremely rough and rocky, containing scattered scrub cedars not commercially valuable and two small springs sufficient for domestic use.... There is on the original entry [the NE 1/4SE 1/4] a stone and log house, double garage, storeroom, and frame bath house, having a reasonable value of $2,300.00." IIA R. Favorable Report. The description matches the land that has since been discovered to be the SW 1/4NE 1/4. The United States would not have issued a patent for the NE 1/4SE 1/4 unless the officials responsible for investigating and issuing the patent were satisfied that Smith had entered the lot and was residing on it. Therefore, the United States erroneously described the lot that it intended to convey.
 
 
 21
 The IBLA and the district court found that Foust had not met his burden of proving a mutual mistake based on three sets of facts: (1) Smith's description of the lands he sought as "rough," "broken," and "uneven"; (2) the lack of an adjoining boundary between the NE 1/4SE 1/4 and the SW 1/4NE 1/4; and (3) the location of the SW 1/4NE 1/4 within a powersite withdrawal and thus unavailable for entry. Nothing about the description of the land as rough, mountainous, uneven, and rocky is inconsistent with the mistake of fact that Foust alleges. The SW 1/4NE 1/4 is apparently rough and rocky; just because it is less so than the NE 1/4SE 1/4 does not mean that Smith or the United States were describing anything other than the land on which Smith built. In fact, the Department of Interior's special agent, at the time he investigated Smith's entry, described the NE 1/4SE 1/4 as being "extremely rough and rocky" and as containing a house, double garage, and other improvements that were later discovered to be on the SW 1/4NE 1/4. IIA R. Favorable Report. Viewing Smith's descriptions in context, it is apparent that he was concerned that he would be required to cultivate this rocky, uneven land in order to receive the patent. His failure to note that there was enough even ground to build a house cannot be fatal, especially when the special agent who inspected the land used similar descriptive terms.
 
 
 22
 The lack of a common boundary between the NE 1/4SE 1/4 and the SW 1/4NE 1/4 does raise a question about how the mistake could have been made. The two pieces of land touch only at one corner. The difficulty of surveying the area at the time because of the rough and steep topography could account for everyone's mistaken belief that Smith had built on the NE 1/4SE 1/4. Regardless of the reason, the lack of an adjoining border cannot overcome the overwhelming evidence that both Smith and the United States referred to the NE 1/4SE 1/4 but described the SW 1/4NE 1/4. See Bowman Transp., 419 U.S. at 284 n. 2, 95 S.Ct. at 441 n. 2. (evidence in administrative record detracting from weight of evidence on which agency makes decision).
 
 
 23
 The availability of the SW 1/4NE 1/4 for entry at the time is irrelevant. The United States believed that the land on which Smith had built was part of the NE 1/4SE 1/4, land available for homesteading. The fact that the United States might not have conveyed this land if it had known its true description does not mean that the United States did not make a correctable mistake. The record shows that the United States intended to convey the land that Smith entered and improved. Accordingly, the IBLA's determination was not based on substantial evidence.
 
 III
 
 24
 "Once the fact of error in the patent is established, the other circumstances of the case must be examined to determine whether considerations of equity and justice warrant amendment of the patent." Ben R. Williams, 57 IBLA 8, 13 (1981). The IBLA found that Foust was not entitled to relief as a matter of equity, because he failed to survey the land at the time he purchased the property and because the Bureau of Indian Affairs (BIA) opposed the patent correction as detrimental to the Indians' interests. The district court affirmed on the same grounds. We review under the "arbitrary and capricious" standard. 5 U.S.C. § 706(2)(A).
 
 
 25
 Foust presents several equitable considerations in his favor. He is elderly, widowed, and living on the land in question. He has lived there for twenty-eight years, paid the taxes, maintained the property, and made further improvements. He would suffer severe economic hardship if he were to lose his home.
 
 
 26
 Foust asserts that he made a title search before purchasing the property but admits that he did not have the property surveyed. However, there is no apparent reason why he should have been on notice that the property required a survey. The original entryman Smith and his wife, who sold the land to Foust in 1963, believed that the lot with the house, other improvements, and stream was the NE 1/4SE 1/4. So did the government and nearby residents. In fact, no one suspected the mistake until 1969, and the mistake could not be confirmed until an extensive resurvey in 1979.
 
 
 27
 Foust was a good faith purchaser, apparently paying full value for the land. Although he could have been more diligent by having the land surveyed, under the circumstances we do not believe he should lose the land just because he relied on the representations of the one who conveyed to him and on the other information that he did obtain. It is too much to expect every purchaser to resurvey on the chance that a patent issued decades before might have misdescribed the land.
 
 
 28
 The BIA's opposition to the patent correction, while a relevant consideration, is also insufficient under the circumstances to prevent the correction. The correction would involve an exchange of land roughly equal in acreage, thus not diminishing the overall number of acres in the Wind River Reservation. Although the SW 1/4NE 1/4 quite likely is more valuable than the land the Indians would receive in return, the Indians have presented no evidence of a difference in land values or of any other harm. A win for the Indians would appear to be a windfall to the extent of the excess value of the improvements. Furthermore, the Indians took no action with respect to the land until the early 1980s, some fifty years after Smith entered the land and nearly forty years after the remaining undisposed land in the area was conveyed to them. Although adverse possession does not run against the Indians, their failure to take some action against the alleged trespass for nearly forty years is a relevant consideration in evaluating the equities of the case. If they did not know that Smith had built on land for which he did not have a patent, this would strongly suggest that they were under the same mistaken assumptions about lot boundaries that were held by the United States, Smith, Foust, and the other area residents. On the other hand, if they did know of the mistake but did nothing about it, they did not value the SW 1/4NE 1/4 highly enough to protect their property rights; they cannot assert now that the land is so valuable that an exchange would prejudice their interests.
 
 
 29
 Because of the severe hardship that Foust would face if he were to lose his home and the insufficiency of the factors on which the IBLA relied, we hold that the IBLA made a clear error of judgment in finding that Foust was not entitled to relief as a matter of equity. The determination was arbitrary and capricious. See Bowman Transp., 419 U.S. at 285, 95 S.Ct. at 441-42.
 
 
 30
 REVERSED.
 
 McKAY, Circuit Judge, dissenting:
 
 31
 Had I been the Interior Board of Land Appeals (IBLA), I would have weighed the facts largely as the majority has done. Because our commission does not give us the weighing function, we are not at liberty to do what the majority has done. For that reason I must respectfully dissent.
 
 
 32
 While I agree with the majority that 43 U.S.C. § 1746 provides statutory authority to reform the deed at issue, I believe that the majority has clearly undervalued the facts and judgments the IBLA relied on and overvalued its own view of the facts. The trial court's summary of the facts which support the IBLA's discretionary decision adequately demonstrates my point. I set it out here in haec verba, omitting only two introductory paragraphs and the judgment paragraph:
 
 
 33
 "The Wind River Indian Reservation, encompassing over 2,000,000 acres in west central Wyoming, was established by treaty between the United States and the Eastern Band of the Shoshone Indians, represented by Chief Washakie and others, on July 3, 1868 at Fort Bridger, Utah Territory. Amidst hopes for peace between the Indians and the whites following an especially violent time in our nation's history, the United States gave back to the Indians in the form of reservations acreage which at best represents a mere fraction of the lands once populated by the Indians. Since the 1868 treaty, the Arapahoes have shared the reservation with the Shoshones. See Shoshone Tribe of Indians v. United States, 299 U.S. 476 [57 S.Ct. 244, 81 L.Ed. 360] (1937).
 
 
 34
 "By the turn of the century, the Shoshone and Arapahoe Indians ceded a portion of the Wind River Indian Reservation to the United States as evidenced by an act of Congress. See Pub.L. 58-185, March 3, 1905, 33 Stat. 1016. On July 2, 1910, certain of the reservation lands were withdrawn by executive order and reserved for water power sites. Plaintiff's Exhs. 59, 60. Included in the withdrawal and reservation was a tract described as Section 28, T. 6N., R. 6E., Wind River Meridian (W.R.M.)--the tract which contains the lands at issue at the administrative level and here. Plaintiff's Exh. 59, p. 3. On November 12, 1927, a survey plat for the above-described township was approved and apparently filed on October 5, 1928. Plaintiff's Exhs. 9, 62. Before the year was out, the lands shown in the survey plat were opened to homestead entry.
 
 
 35
 "On December 9, 1929, one Byron H. Smith filed a petition for designation of the NE 1/4SE 1/4 of Section 28, T. 6N., R. 6E., W.R.M. as stock raising lands, along with an application, serialized by the Cheyenne land office as 050733, for entry onto that parcel. Plaintiff's Exhs. 42, 43. Smith's petition was denied with the explanation that the land was not subject to homestead entry under the Act of March 3, 1905. On December 15, 1929, Smith appealed the denial and eventually prevailed. Plaintiff's Exhs. 45, 50.
 
 
 36
 "On July 9, 1930 Smith filed a supplemental homestead entry application C-050733 for the NE 1/4SE 1/4 set out above. Later, he filed a petition/application C-051835 for stock raising homestead entry onto lots 4 and 5 (see appendix) of Section 28, T. 6N., R. 6E., W.R.M., which lots adjoin the NE 1/4SE 1/4. See A.R. Part 2. On August 29, 1930, lots 4 and 5, previously withdrawn for power sites, were restored to entry pursuant to section 24 of the Federal Power Act (FPA), as amended, 16 U.S.C. § 818 (1982). Plaintiff's Exh. 58. By October 4, 1930, Smith had filed for designation of lots 4 and 5 as stock raising homestead lands. Plaintiff's Exh. 34. Smith filed a final proof for entries C-050733 and C-051835 on September 3, 1935, listing the improvements made to these lands, to-wit: a house, double garage, and other buildings on the NE 1/4SE 1/4, a house, garage, and cellar on lot 4, and a fenced garden on lot 5. Plaintiff's Exh. 35 at p 12(a). In November 1936, Smith received patents for lots 4 and 5 and the NE 1/4SE 1/4. Plaintiff's Exhs. 31, 32. In 1942, all undisposed ceded land east of the Big Horn River (Wind River) and within Section 28, T. 6N., R. 6E. became tribal land.
 
 
 37
 "Plaintiff Foust entered the picture on June 19, 1963 when he and his now deceased wife received title to lots 4 and 5 and the NE 1/4SE 1/4 by warranty deed from Smith's widow. Plaintiff's Exh. 7. The Fousts, in turn, conveyed a part of lot 4 to Erwin and Donna Roberts by warranty deed on May 4, 1979. Plaintiff's Exh. 78.
 
 
 38
 "Problems began to arise shortly after Foust obtained the lands. The Bureau of Indian Affairs (BIA), in 1968 or 1969, suspected that Foust's home and the other improvements were located on tribal lands and asked that the BLM perform an official survey. Between October and November 1979, a resurvey of the subject plat was undertaken resulting in the redesignation of the S 1/2NE 1/4 of Section 28, T. 6N., R. 6E., W.R.M. as lots 9, 10, 11, and 12. The resurvey revealed that the house and other buildings Smith had built and indicated as being on the NE 1/4SE 1/4 were, in actuality, located within the SW 1/4NE 1/4 on lot 11.[1] Various options to remedy the trespass were advanced by Foust and the Government, including such proposals as exchanges of land, payments of past rentals, and entering into a lessor-lessee arrangement with the tribes. None were deemed acceptable. So the Fousts applied to the BLM for a patent correction on May 3, 1982 whereby lot 5 would be deeded back to the United States in exchange for lots 9, 11, and 12, a quantitatively similar transaction. A.R. Part 3. (Plaintiff's Exh. 20). The tribes subsequently sought declaratory relief in this Court to nullify the patents, an action which was later dismissed in order to enable patent correction proceedings to continue at the administrative level. See Plaintiff's Exhs. 2, 3.
 
 
 39
 "On December 30, 1985, the BLM issued a decision approving Foust's application for correction. A.R. Part 4 (Plaintiff's Exh. 28). The tribes appealed and obtained a reversal from the IBLA in a lengthy decision authored by Administrative Law Judge (ALJ) Franklin Arness. Plaintiff's Exh. 1. Foust now appeals the IBLA decision to this Court, contending that the agency action was arbitrary and capricious.
 
 
 40
 "Under the Administrative Procedure Act (APA), 5 U.S.C. § 500 et seq., the scope of judicial review of final agency action is a very deferential one whereby a reviewing court can set aside agency action which is found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law....' 5 U.S.C. § 706(2)(A) (1982). See also Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 [91 S.Ct. 814, 28 L.Ed.2d 136] (1971) and Edwards v. Califano, 619 F.2d 865 (10th Cir.1980). This narrow standard of review requires the Court to ascertain whether the agency based its decision on relevant factors or whether it made a clear error of judgment. Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281 [95 S.Ct. 438, 42 L.Ed.2d 447] (1974), reh'g denied, 420 U.S. 956 [95 S.Ct. 1340, 43 L.Ed.2d 433] (1975).
 
 
 41
 "A reviewing court may also set aside an agency decision it finds to be unsupported by substantial evidence in the record. 5 U.S.C. § 706(2)(E) (1982). Substantial evidence means ' "more than a mere scintilla" '; it is ' "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ' Richardson v. Perales, 402 U.S. 389, 401 [91 S.Ct. 1420, 1427, 28 L.Ed.2d 842] (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 [59 S.Ct. 206, 83 L.Ed. 126] (1938)). While it is permissible for a court to engage in substantial inquiry into the facts, absent clear error, it must be wary to substitute its judgment for that of an expert agency. Independent Meat Packers Ass'n v. Butz, 526 F.2d 228, 238 (8th Cir.1975), cert. denied, 424 U.S. 966 (1976). See also FCC v. National Citizens Committee for Broadcasting, 436 U.S. 775 [98 S.Ct. 2096, 56 L.Ed.2d 697] (1978) and New Mexico Environmental Imp. Div. v. Thomas, 789 F.2d 825, 835 (10th Cir.1986).
 
 
 42
 "Section 316 of the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1746, gives the Secretary of the Interior (Secretary) the authority, in permissive terms, to 'correct patents or documents of conveyance ... relating to the disposal of public lands where necessary in order to eliminate errors.' A further regulatory provision explains the errors subject to correction:
 
 
 43
 'Error' means the inclusion of erroneous descriptions, terms, conditions, covenants, reservations, provisions and names or the omission of requisite descriptions, terms, conditions, covenants, reservations, provisions and names either in their entirety or in part, in a patent or document of conveyance as a result of factual error. This term is limited to mistakes of fact and not of law."
 
 
 44
 43 C.F.R. § 1865.0-5(b) (1988) (emphasis added).
 
 
 45
 "Although the BLM found that circumstances warranted a patent correction, the IBLA was not so easily convinced. It found that Foust had not, and indeed could not, show that the patents in question suffered from a mistake of fact. The IBLA reviewed Smith's petitions and applications for the NE 1/4SE 1/4 and lots 4 and 5 and the descriptions he gave for these lands and concluded that Smith's descriptions fit the lands contained in his patents. They could not have referred to what is now lot 11, colloquially known as the 'draw,' since this small parcel is the only area within Section 28 flat enough to support a homestead.
 
 
 46
 "Another inconsistency militating against a factual mistake, in the view of the IBLA, came from a statement of Foust to the effect that Smith intended to build his homestead on lot 5. Such a statement, the IBLA found, was simply incongruous to Smith's own written submissions describing the house and other improvements as being situated on the NE 1/4SE 1/4, not on lot 5. With that the case, the relative locations of the SW 1/4NE 1/4, which contains lots 9, 11, and 12, and the NE 1/4SE 1/4, touching as they do at one corner and not sharing any common boundaries made it that much more unlikely, as far as the IBLA panel was concerned, that a mistaken description was involved.
 
 
 47
 "Then came the area of land in which lot 11 is located, the SW 1/4NE 1/4. As the IBLA observed, the SW 1/4NE 1/4 was withdrawn from entry for power site purposes during all pertinent periods and remained so until its restoration to tribal ownership in 1942. Had Smith applied for entry onto what is now lot 11, the IBLA points out, no patent would have issued for this reason.[2] This fact alone, in the words of ALJ Arness, 'negates entirely the possibility that a mistake was made in the description of the patented land.' Shoshone and Arapahoe Tribes, 102 IBLA at 256, 268 (May 23, 1988) (footnote omitted).
 
 
 48
 "With the law against Foust, the IBLA turned to a consideration of the equities. It concluded that equity was not on Foust's side because he did not exercise due diligence in verifying the correctness of the property being conveyed to him. When Foust was in the process of acquiring the lands, he asked about a survey and apparently was told that no reliable survey was available given the terrain. This, according to the IBLA, should have alerted Foust that problems with description might be present. Influential to the IBLA was the fact that a BIA range conservationist had discovered the trespass after an aerial overview as early as 1968, an event which led to a dependent resurvey in 1980 after a somewhat unusual delay in notifying the tribes of the suspected trespass. Any argument that discovery of the trespass was impossible prior to this resurvey was discounted by the IBLA. In the words of ALJ Arness:
 
 
 49
 Both the 1928 homestead opening and powersite withdrawal were described by reference to the 1928 survey, which was available both to Smith and Foust. The 1928 survey shows the lots and quarter quarters of sec. 28 and the general topography of the land. The 1928 survey also shows the draw where Smith built, and it shows that the draw was not within the land patented to Smith, but that it was located instead within the powersite withdrawal in the SW 1/4NE 1/4. The BIA range conservationist who detected the trespass did not need to leave his office to see that there was a trespass.
 
 
 50
 102 IBLA at 271 (emphasis added).
 
 
 51
 "On appeal, Foust maintains that the IBLA misapplied the law by ignoring the corrective mechanism of the FLPMA. Plaintiff's basic argument revolves around the FPA, 16 U.S.C. § 818, which provides for entry onto withdrawn lands upon a determination of the Federal Power Commission (FPC) that the value of the reserved lands for powersite purposes will not be diminished if location is permitted. Under § 818, the Secretary is given no alternative but to open lands so determined to entry under any terms imposed by the FPC. Plaintiff treats this process as a mere formality, arguing that had Smith filed an application for entry onto lot 11, the § 818 determination would have been made as a matter of course as evidenced by the many similar determinations the FPC has made for other homesteaders in the region. Moreover, to allow a decision regarding an application for patent correction to turn upon the availability for entry of the land sought to be included at the time such entry was made, as the IBLA did, especially when placed in the light of § 1746, amended as it was to exclude previous language requiring consideration of the status of the land, is clearly erroneous insists Foust.
 
 
 52
 "Plaintiff maintains that Smith mistakenly described the land upon which he built his home and other buildings. Anyone who looks at the lay of the land, says Foust, will see that lot 11 is the only parcel in close proximity to the patented lands which is unencumbered by rocky, mountainous terrain and cliffs and thus suitable for building purposes. As further support for the mistake theory, Foust points to: (1) sworn statements of subscribing witnesses who live and have grown up in the canyon, relating their beliefs that Smith's improvements were on lots 4 and 5; (2) an abstract of title, given to Foust, wherein the Smith improvements are described as being on lots 4 and 5; (3) BLM and General Land Office worksheets showing the improvements as being on lots 4 and 5; and (4) the warranty deed to Foust as well as his affidavit to the effect that Smith's widow told him the improvements were located on lot 5.
 
 
 53
 "Aside from all this, the plaintiff argues that the equities are with him. According to Foust, who has lived on the disputed lot for over 25 years, the only reason the tribes are pursuing what will amount to an ejectment action if they prevail, is out of vindictiveness for Foust's sale of a portion of lot 4 to a non-Indian who offered a higher price than the tribes did. This bad faith theory, believes Foust, is supported by the fact that no other entrymen on lands which were subject to the powersite reservation in the canyon area have had their claims challenged by the tribes.
 
 
 54
 "The United States and the tribes rely on the 1942 restoration order which gave back to the Indians all lands opened under the 1905 Act and undisposed of. This included the SW 1/4NE 1/4--lots 9, 11, and 12. So, if Smith had described lot 11 in his application, a patent would have been denied. More than twenty years after this restoration, Foust purchased the Smith property. Had plaintiff exercised due diligence in ascertaining the propriety of the conveyance, urge these parties, the discrepancy would have been readily discovered.
 
 
 55
 "As for plaintiff's mistake theory, the United States and the tribes simply point to statements of Smith which describe the subject improvements as being on the NE 1/4SE 1/4. Other indicia negating this theory include Smith's descriptions of the patented lands as 'rough,' 'rocky,' 'very hilly,' and 'very mountainous' as well as the stockraising designation he sought for lots 4 and 5 when, according to a range conservationist, section 28 contains very little grass and no access to suitable open range land in other sections. Rather, the tribes allege, Smith built on lot 11 when he saw the desirability of the land for a scenic home.
 
 
 56
 "The tribes remind the Court that the equities are not with the plaintiff, principally because he failed to exercise reasonable diligence before purchasing from Smith's widow. Foust could have easily performed the necessary verification but chose not to. Other relevant equity considerations advanced by the Indians include length of residence on the land and expenditures to acquire and improve it, factors which would weigh heavily in favor of the original patentee Smith or his heirs but not an arms-length transferee like plaintiff.
 
 
 57
 "The United States holds tribal lands in trust for the Indians. Poafpybitty v. Skelly Oil Co., 390 U.S. 365, 368 [88 S.Ct. 982, 983-84, 19 L.Ed.2d 1238] (1968). See also Manygoats v. Kleppe, 558 F.2d 556, 557 (10th Cir.1977). The BIA is charged with carrying out this trust obligation. Poafpybitty, 390 U.S. at 374 [88 S.Ct. at 986]. So strong is our commitment to protect Indian lands that whenever a dispute develops between a white person and an Indian over lands where an Indian presumption of title has been established, it is the white person who shoulders the burden of persuasion and the burden of producing evidence to the contrary. 25 U.S.C. § 194. See also Wilson v. Omaha Indian Tribe, 442 U.S. 653, 669 [99 S.Ct. 2529, 2538-39, 61 L.Ed.2d 153] (1979). Such provision was seen as a means of preventing non-Indian squatters from setting up residence on tribal lands. Id. at 667 [99 S.Ct. at 2537-38].
 
 
 58
 "Whether or not Smith was a squatter is left for history. All that can be said is that Smith received patents to certain lands. A government patent is the most accredited type of conveyance known to the law. United States v. Cherokee Nation, 474 F.2d 628, 634 n. 16 (Ct.Cl.1973). Only the lands set forth in a patent pass to an entryman; nothing passes by implication. Walton v. United States, 415 F.2d 121, 123 (10th Cir.1969). As set out above, Smith received patents for lots 4, 5, and the NE 1/4SE 1/4--nothing more, nothing less. Yet he built a home and other improvements on land not designated in the patent--land withdrawn from entry at the time and later tribal land, not public land.
 
 
 59
 "Notwithstanding this, plaintiff, as Smith's successor-in-interest, asks this Court to allow the patents to be corrected, giving him rights to a parcel of land which Smith, as the original patentee, had no right to in the first place not only because of its absence in the patent documents but also by virtue of the reserved status of the SW 1/4NE 1/4 at the time of Smith's entry. Foust's argument to the effect that the IBLA misapplied § 1746 of the FLPMA is for naught. Likewise, the after-the-fact justification for Smith's intrusion, namely that had he applied for entry onto the then withdrawn SW 1/4NE 1/4, the application would have been granted as a matter of routine following the § 818 determination is unpersuasive. The fact of the matter remains that Smith never made any inroads in that direction but, more importantly, no evidence before this Court supports plaintiff's assertion regarding the frequency with which applications for entry onto withdrawn lands are approved. Moreover, approval of applications for entry under § 818 are not as quick as plaintiff would seem to suggest. Under § 818, following the notice of determination of no injury, the Secretary is required to give the governor of the state within which the lands sought to be entered are located ninety days from the date of such notice to determine whether the land should be reserved to the state rather than approved for entry by a private person. At any rate, "[a] patent cannot convey what has been reserved by law." Leo Sheep Co. v. United States, 570 F.2d 881, 888 (10th Cir.1977), rev'd on other grounds, 440 U.S. 668 [99 S.Ct. 1403, 59 L.Ed.2d 677] (1979).
 
 
 60
 "Admittedly, plaintiff's point regarding the difference between § 1746 of the FLPMA and its predecessor, primarily from the standpoint of the excision of language where the decision on whether to approve a request for a patent correction turned on the availability of the land sought to be included for entry, deserves closer attention. Although the legislative history is silent as to why the prior language was deleted, the 1976 amendments to the FLPMA were a response to calls for the modernization of the nation's public land laws, many of which were regarded as obsolete. 1976 U.S.Code Cong. & Admin.News 6175. While on-the-record clarification by Congress would have been helpful to disposition of this issue, the lack of such elaboration is not fatal because any ambiguity in a statute is interpreted in favor of the Indians whenever Indian treaty rights or nontreaty matters involving Indians are at stake. Equal Employment Opportunity Commission v. Cherokee Nation, 871 F.2d 937, 939 (10th Cir.1989). The Court views the deletion of the entry language from § 1746 as part of a concerted effort to simplify public land administration while retaining the basic precepts of public land law.
 
 
 61
 "Were the Court to sanction plaintiff's interpretation of § 1746, the question of availability of entry would become irrelevant, conceivably threatening all lands in the public domain. Such wholesale exploitation of the purposes behind the public land laws and, more particularly, the trust status of Indian lands was not intended by Congress.
 
 
 62
 "Foust cannot be regarded as a bona fide purchaser under the circumstances of this case. When told that no reliable survey of the area was available, a reasonable person would have exercised diligence in attempting to ascertain the propriety of his purchase. As shown above, the pertinent materials which would have disclosed the defect in the conveyance were available at the time of and before Foust's purchase, but he chose not to pursue the matter.
 
 
 63
 "His reliance on a prior IBLA decision, Mantle Ranch Corp., 47 IBLA 17 (April 11, 1980), as supportive of a patent correction is misplaced; for, in that case, the successors-in-interest were heirs to the original patentee who mistakenly described the lands entered. All concerned agencies expressed their approval of the correction sought. The IBLA described the equities thus:
 
 
 64
 Not only has the land been occupied and claimed since 1919, the tract in sec. 17 has actually been the site of the family home for more than 40 years and is the place where Tim Mantle, the present occupant, was born. The heirs of Charles Mantle are entitled to what their father and husband actually earned by his compliance with the homestead law."
 
 
 65
 Id. at 38. No such circumstance exists here.[3] Foust is merely an arms-length transferee whose equitable interest, if existent, is minimal.
 
 
 66
 "Of particular importance, the BIA, as executor of the trust responsibility to the tribes, opposes the patent correction sought by Foust, as shown in the following excerpt from the IBLA decision:
 
 
 67
 'Please be advised that the Bureau of Indian Affairs opposes the application to correct Mr. Foust's homestead patent. Based on the facts of this case, it is our opinion that a correction of the patent would be detrimental to the Shoshone and Arapahoe Tribes. Further, it is not clear that an error of the description was made.' "
 
 
 68
 Shoshone and Arapahoe Tribes, 102 IBLA at 274 (quoting Memorandum dated June 16, 1983 from BIA Director to BLM).
 
 
 69
 "In sum, an extensive review of the administrative record compiled in this matter convinces the Court that the IBLA decision is not arbitrary and capricious but, rather, is supported by substantial evidence and is in conformity with the law. Unlike the BLM, the IBLA carefully considered all relevant issues and correctly applied equitable and legal principles to the facts before it.
 
 
 70
 "The mistake theory plaintiff propounds is simply unsupportable. So many facts and circumstances surrounding Smith and his applications exist, only some of which have been addressed above, that a conclusion of mistaken description would stretch the benefit of the doubt to its breaking point. As can be seen from the appendix which accompanies this decision, the relative proximities of the NE 1/4SE 1/4 (where Smith indicated he built his house and other buildings), lot 5 (where others say Smith built his house but Smith says he only had a garden fence), and lot 11 (where Smith actually built his house and other buildings) are such that it was not reasonably likely for Smith to have mistakenly built on lot 11 in the SW 1/4NE 1/4.
 
 
 71
 "As for Foust, he owed a duty, as a purchaser of real property, to exercise that diligence any reasonable person would have exercised to verify the identity of the lands he was purchasing prior to accepting the conveyance. Instead, he remained indifferent and took his chances. Now comes the time to pay the price for that indifference."
 
 
 72
 Foust v. Lujan, No. C88-235-K (D.Wyo. Nov. 15, 1989).
 
 
 73
 I add only these two observations. The reason for the grossly erroneous description by the original entryman who was otherwise so fulsome in description seems patent: the correct quarter section description would not have been open to entry. Finally, to argue that the tribe has presented no evidence of a difference in land values is refuted by the court's own earlier recitation of why the original entryman chose the site in issue.
 
 
 74
 I would affirm.
 
 
 
 [1]
 Aside from the trespass question, the significance of this discovery lies in the fact that at the time Smith built his home and other improvements, the area now designated as lot 11 was still reserved as a powersite and had not been restored to entry
 
 
 [2]
 Foust disputes this, regarding the withdrawal status of the SW 1/4NE 1/4 as a minor impediment which, upon application for entry, would have been removed as a matter of routine. As explained in greater detail below, this position is entirely unpersuasive
 
 
 [3]
 Mantle, unlike Smith, enlisted the help of a surveyor to draw the application and relied upon him to describe the lands correctly. Mantle Ranch Corp., 47 IBLA at 21