## SHOSHONE TRIBE OF INDIANS *v.* UNITED STATES.*

No. 216.   Argued December 17, 18, 1936.—Decided January 4, 1937.

---

*Together with No. 328, *United States* v. *Shoshone Tribe of Indians*.   Certiorari to the Court of Claims.

*Messrs. George M. Tunison* and *Albert W. Jefferis,* with whom *Messrs. Charles J. Kappler* and *Francis S. Howell* were on the brief, for the Shoshone Tribe of Indians.

478

480

*Assistant Attorney General Blair*, with whom *Solicitor General Reed* and *Messrs. George T. Stormont, Charles H. Small,* and *W. Marvin Smith* were on the brief, for the United States.

Mr. Justice Cardozo delivered the opinion of the Court.

The Shoshone Tribe of Indians of the Wind River Reservation in Wyoming has sued the United States in the Court of Claims for the breach of treaty stipulations, whereby the tribe has been permanently excluded from the possession and enjoyment of an undivided half interest in the tribal lands. Jurisdiction to hear the claim was conferred upon the Court of Claims by an act of March 3, 1927 (44 Stat. 1349, Part II), which, so far as its provisions are now material, is quoted in the margin.[1]

---

[1] Section 1 provides that jurisdiction is "conferred upon the Court of Claims, with right of appeal to the Supreme Court of the United States by either party, notwithstanding the lapse of time or statutes of limitation, to hear, examine, adjudicate, and render judgment in any and all legal and equitable claims which the Shoshone Tribe of Indians of the Wind River Reservation in the State of Wyoming may have against the United States arising under or growing out of the treaty of July 3, 1868 (Fifteenth Statutes, page 673), or

The court gave judgment for the claimant. Neither party to the controversy was satisfied with the award of damages, the claimant finding it too low, and the Government too high. There were cross-petitions for certiorari. To fix with certainty and justice the rights and duties of the Government in its relations with an Indian tribe, the writs were allowed, and the case is here accordingly.

By treaty of July 3, 1868 (15 Stat. 673), the Shoshone Tribe of Indians relinquished to the United States a reservation of 44,672,000 acres in Colorado, Utah, Idaho and Wyoming, and accepted in exchange a reservation of 3,054,182 acres in Wyoming, with other benefits not now important. The United States agreed that the territory described in the treaty now generally known as the Wind River Reservation, would be "set apart for the absolute and undisturbed use and occupation of the Shoshone Indians . . . and for such other friendly tribes

---

arising under or growing out of any subsequent treaty or agreement between said Shoshone Tribe of Indians and the United States or any subsequent Act of Congress affecting said tribe, which claims have not heretofore been determined and adjudicated upon their merits by the Court of Claims or the Supreme Court of the United States."

Section 3 provides: "In said suit the court shall also hear, examine, and adjudicate any claims which the United States may have against said tribe, but any payment, including gratuities which the United States may have made to said tribe, shall not operate as an estoppel, but may be pleaded as an offset in such suit: *Provided, however,* That the United States may interpose to such suit or action any and all pleas of defense, affirmative and negative, legal and equitable, which it may have thereto not herein specifically barred by the provisions of this Act. In reference to all claims which may be the subject matter of the suits herein authorized, the decree of the court shall be in full settlement of all damages, if any, committed by the Government of the United States and shall annul and cancel all claim, right, and title of the said Shoshone Indians in and to such money, lands, or other property."

or individual Indians as from time to time they may be willing, with the consent of the United States, to admit amongst them." Reinforcing this covenant, there was a solemn pledge of faith by the United States that no persons, except a few specially enumerated, and governmental agents engaged in the discharge of duties enjoined by law, should "ever be permitted to pass over, settle upon, or reside" in the territory so reserved. The loyalty of the Shoshone tribe to the people of the United States has been conspicuous and unfaltering. A fidelity at least as constant and inflexible was owing in return.

In 1869, a band of the Northern Arapahoes, separating from the main body of the nation, was wandering about the country, looking for a home. The Arapahoes had been allies of the Sioux, who were the foes of the Shoshones. None the less, the wanderers expressed a wish to have a refuge and a settlement on the Wind River Reservation. They came upon the Reservation in 1870, and were informed by Washakie, Chief of the Shoshones, that they would be permitted to stay there for a short time while the Government was seeking to place them elsewhere. After a few months they moved away. The Government had no success, however, in providing them with a satisfactory home, and they continued to cast longing eyes toward the fair and fertile acres set apart for their ancestral foes. At the instance of the Commissioner of Indian Affairs, acting in coöperation with the Secretary of the Interior, a new attempt was made in October, 1877, to bring the tribes together and relieve the growing tension developing between them. One Irwin, formerly the Indian agent on the Wind River Reservation, discussed the problem with Washakie. He said that the President had no intention of placing the Arapahoes on the Shoshone Reservation, but that the desire was merely to insure peace between the tribes and to find a place for the Arapahoes nearby, on a separate tract of

land close to the eastern boundary. Washakie agreed that there should be peace, but insisted that the traditional enemies of his tribe be placed at a safe distance, predicting that close contact would bring friction and fresh hostility.

Irwin telegraphed the Commissioner of Indian Affairs at Washington on October 17, 1877: "I returned from Shoshone Agency today. Held a council and made peace between Shoshones and Arapahoes." A written report, dated February 21, 1878, gave the details of the council. Even so, the telegram, it seems, had been misunderstood by the Commissioner, for in his annual report for 1877 (dated November 1, 1877), he said (p. 19): "In a formal council held last month by Agent Irwin with the Shoshones, their consent to the arrangement desired by the Arapahoes was obtained, and the removal of the latter is now in progress." Ignoring many warnings in February and later that consent had been refused, the Commissioner adhered to his erroneous assumption. The consequences of his error are visible in the events that followed.

On March 18, 1878, a band of Northern Arapahoes was brought to the Reservation of the Shoshones under military escort. The Reservation had been reduced to 2,343,000 acres by the cession of 700,642 acres in 1874 for a money consideration. The Shoshones believed that for hunting and for husbandry it was not in excess of present needs. The unheralded arrival of the Arapahoes was the cause of much excitement. There was a council the next day, at which the leader of the Arapahoes explained to Washakie that they and their horses were weary and without food, and in need of rest and care. Thereupon Washakie agreed that they might remain for a short time to rest their horses and themselves. But the Indian Commissioner, it seems, had not brought them to the reservation for any temporary visit. On April 2, 1878, he telegraphed the agent at the Reservation to furnish the

Arapahoes with the necessary food and supplies, and
directed him to "report fully by mail what other measures
are necessary to locate the Band of Northern Arapahoe
Indians under Black Coal," their leader. The agent re-
sponded that the Shoshones looked upon the presence of
the Arapahoes as "an encroachment on their rights." At
the request of both tribes, he urged the calling of a council
to be attended by the Department Commander, General
Crook, in order that the location of the Arapahoes might
be permanently settled. No reply to this request came
from the Commissioner or from any one else.

The famished Arapahoes and their horses had been fed
and cared for, but they did not move away. Instead of
moving away, they came in increasing numbers. As
early as April 8, 1878, nearly the whole tribe was on the
scene. Washakie protested to the agent. The agent at
frequent intervals communicated the protests to the Com-
missioner. There was nothing in return but silence.
Months lengthened into years, and the signs accumulated
steadily that the Arapahoes were there to stay. Schools
were established for their benefit to the end that their
youth might be adequately trained. Report of Commis-
sioner of Indian Affairs, 1879, p. 169. Ditches were dug
for the irrigation of their ranches. Report of Commis-
sioner of Indian Affairs, 1889, p. 308. In numberless
other ways, their equality of right and privilege became
a postulate of daily life. At length in August, 1891, the
flame of controversy blazed forth anew. The "Woodruff
Commission" had been sent to the Reservation to treat
with the Indians for a cession of a portion of their lands.
The Shoshones took the ground that the Arapahoes
should not be suffered to take part in the council and
vote upon the projects. The Commission telegraphed the
Commissioner of Indian Affairs asking for instructions.
In reply, August 13, 1891, the Commissioner notified the
Commission: "This office holds . . . that the Arap-

ahoes have equal rights to the land on the said reservation which does not depend upon the further consent of the Shoshones, and you should conduct your negotiations with them upon that basis and with that understanding." Accordingly, both tribes participated in the council, though a cession was not effected.

The Commissioner continued to act on the assumption that the occupancy of the Arapahoes, initiated, as we have seen, under military escort, was permanent and rightful. What is more to the point, Congress did the same. Thus, in 1897, the Government by its agent concluded an agreement with the Shoshones and Arapahoes whereby the Indians ceded to the Government part of the Shoshones Reservation (55,040 acres) for $60,000, to be expended without discrimination among the members of the tribes. In preliminary conferences the Shoshones protested that they alone should receive the stipulated payments. Their protest was overruled, though they succeeded in adding a proviso that nothing in the agreement was to be construed to deprive them of their annuities or benefits under any existing agreements or treaty stipulations. This agreement with its clear recognition of the occupancy of the Arapahoes and their equal interest in the land, was ratified by act of Congress. Act of June 7, 1897, c. 3, 30 Stat. 62, 93, 94. Again, on April 21, 1904, the Government made an agreement with the two tribes for the cession of a large tract (1,480,000 acres), leaving only 808,500 acres in the diminished reservation. Again the Shoshones protested that the Arapahoes were intruders, and refused to sign without a proviso similar to the one in the agreement of 1897.[2]

---

[2] "Article X. It is further understood that nothing in this agreement shall be construed to deprive the said Indians of the Shoshone or Wind River Reservation, Wyoming, of any benefits to which they are entitled under existing treaties or agreements, not inconsistent with the provisions of this agreement."

Again the Government dealt with the two tribes as lawful occupants and equals. This agreement like the earlier one was ratified by act of Congress. Act of March 3, 1905, c. 1452, 33 Stat. 1016. It provides *inter alia* that "any individual Indian, a member of the Shoshone or Arapahoe tribes, who has, under existing laws or treaty stipulations, selected a tract of land within the portion of said reservation hereby ceded, shall be entitled to have the same allotted and confirmed to him or her, and any Indian who has made or received an allotment of land within the ceded territory shall have the right to surrender such allotment and select other lands within the diminished reserve in lieu thereof at any time before the lands hereby ceded shall be opened for entry." There is a finding that 245,058 acres were allotted to Shoshone and Arapahoe Indians between 1907 and 1919 under the power thus conferred. Many other provisions of the agreement and the statute are almost equally explicit and significant in their recognition of the *status quo*. Nowhere is there a suggestion that the occupancy of the newcomers is impermanent or provisional.

The Arapahoes held their ground, pushing the Shoshones farther to the west, and retaining for themselves the eastern section of the Reservation, found by the Court of Claims to be the most eligible portion. At all times the population of each of the two tribes has been approximately equal. There continued to come forth from the Shoshones intermittent protests, which at last reached the halls of Congress, and in 1927 had a long delayed fruition. In that year the Committee on Indian Affairs of the House of Representatives reported a bill to make atonement for the wrongs that for nearly half a century had been left without redress. House Report No. 1628, 69th Congress, 2nd Session, Congressional Record, vol. 68, part 1, p. 625.

Extracts from that report are printed in the margin.[3]  The bill so proposed was passed, but was vetoed by the President, chiefly for the reason that it made provision for the payment of interest at five per cent per annum on the value of any property appropriated in violation of the treaty or wrongfully disposed of.  Congressional Record, vol. 68, part 3, page 2414, 69th Congress, 2nd session.  On February 4, 1927, the Senate Committee on Indian Affairs reported a new bill, with the statement that it had been redrafted to correct the objection of the President and that it was identical with the earlier bill except for the interest provision, though in truth other verbal changes had been made in the process of revision.  Senate Report No. 1389, Congressional Record, vol. 68, part 3, p. 2921. The bill so revised became Chapter 302 of the Laws of 1927, the jurisdictional act under which the present suit has been maintained.

Upon these facts the Court of Claims decided that the occupancy of the Arapahoes became definitive and perma-

---

[3] "Despite the fact that the United States expressly guaranteed to these Indians the uninterrupted use and occupancy of the reservation, and against the protests of the Shoshones of said Wind River Reservation in Wyoming, the northern band of the Arapahoes, under military escort, were moved upon said reservation in the winter of 1877–78.

"In order to disarm the Shoshones they were assured by the military authorities that the Arapahoes would be removed from the reservation the following year.  Since then the Shoshones have frequently protested against the alleged unlawful appropriation of their reservation but have received no relief from the Government.  On the contrary, the Government has allowed the Arapahoes upon the reservation and treated the funds claimed by the Shoshones as though they were the joint property of both tribes.

"The purpose of the bill is to permit the Shoshones to submit their claims for alleged appropriation of property to the Court of Claims, and your committee feels that in view of the strong showing made the bill should be enacted at an early date."

nent on August 13, 1891, when the Commissioner of Indian Affairs made public statement of his opinion that they were entitled to enjoy the Reservation equally with the Shoshones. The value at that time of an undivided half interest in the land was found to be $2,050,597.50. The value of the use and occupation between March 18, 1878 and August 13, 1891, was fixed at $332,475. The sum of these values, along with a few minor items, was $2,483,467.99, from which there was a deduction of $1,689,-646.50, for offsets owing to the Government, and not in controversy here. The balance, $793,821.49 is the amount of the judgment now before us for review. As already stated, neither the claimant nor the Government is content with the decision. Both agree that there was error in fixing the value of the land as of August 13, 1891. The claimant insists that it should be reckoned as of March 3, 1927, the date of the jurisdictional act, and that compensation should be added for the value of the intermediate use and occupation. The Government insists that the value should be reckoned as of March 18, 1878, when the unlawful occupancy began. The claimant makes the additional point that, irrespective of the date at which the value is computed, interest must be awarded up to the date of the judgment on the recovery allowed.

*First.* The Court of Claims did not err in refusing to fix the damages on the basis of the value of the land on March 3, 1927.

The claimant takes the ground that the jurisdictional act is an exercise of the power of eminent domain. The argument is that by force of its provisions a trespass which had been unlawful, though continuous, since March 18, 1878, was turned as of March, 1927, into a definitive and lawful taking. But this is to mistake utterly the design and meaning of the statute. The jurisdictional act is not a taking of anything. It "makes no admission of liability, or of any ground of liability, on the

part of the Government, but merely provides a forum for the adjudication of the claim according to applicable legal principles." *United States* v. *Mille Lac Band of Chippewa Indians,* 229 U. S. 498, 500. No cause of action can be vindicated thereunder unless such a cause of action as, apart from the impediment of governmental immunity from suit, was already in existence. Under the jurisdictional act the court is to inquire whether the violation of the treaty of 1868 or of some later treaty or agreement or some later act of Congress has given rise to legal or equitable grounds of liability. True, the decree when it is made "shall be in full settlement of all damages, if any, committed by the Government of the United States and shall annul and cancel all claim, right, and title of the Shoshone Indians in and to such money, lands, or other property." But the claimant is not subject to a duty either under that act or any other to sue the Government at all. In the event of a failure to sue or to prosecute the suit to a decree, rights and liabilities will remain as they were before any act was passed. The sovereign power is not exercised to extinguish titles or other interests against the will of tribal occupants by force of eminent domain.

If this conclusion might otherwise be doubtful (which we do not suggest), the doubt would be dispelled by a consideration of the history of the statute. The reports of the Committees of Congress preceding the two bills— the one vetoed by the President and the one enacted into law—make it plain that the purpose was to give reparation to the claimant for an "alleged unlawful appropriation" effected in the past, not to make a new and lawful appropriation by an exercise of sovereign power. So the message of the President vetoing the first bill which permitted an award of interest, adds this comment to a sketch of the grievance of the tribe: "It seems to me unreasonable to expect that the Government should be

charged with interest from the dates of origin of such ancient claims." Congress had no thought in its revision of the rejected bill to prescribe present expropriation in lieu of present reparation. As pointed out already, the bill redrafted was understood to be identical with the first one except that the interest provision had been dropped to meet the President's objection.

*Second.* The Court of Claims erred in holding that damages should be measured as of August 13, 1891, the date of the letter from the Commissioner of Indian Affairs to the Woodruff Commission, and in failing to measure them as of 1878, the date of the unlawful entry.

The treaty of 1868 charged the Government with a duty to see to it that strangers should never be permitted without the consent of the Shoshones to settle upon or reside in the Wind River Reservation. That duty was not fulfilled. Instead, the Arapahoes were brought upon the Reservation with a show of military power, and kept there in defiance of the duty to expel them. The decision below is based upon the theory that the letter of August 13, 1891, is the earliest overt act evincing a definitive purpose to make the occupancy permanent. But the Commissioner of Indian Affairs was not empowered to fix the future policy of the Government, still less to exercise in its behalf the power of eminent domain. He made no such attempt. All that his letter of August, 1891, expresses is an opinion as to the meaning and operation of notorious and accomplished facts. By deed as well as by word, he had done his part for more than thirteen years in shaping those facts to conform to his opinion. He had made report to the Secretary of the Interior in November, 1877, that the transfer of the Arapahoes to the Wind River Reservation was a movement then in progress. He had notified the local agent in April, 1878, to indicate any other measures necessary to settle the intruders. He had turned a deaf ear to many a remonstrance by the tribe

whose possession had been violated. In so far as his own opinion and intention were facts of any moment, he had manifested them too often and too plainly, by conduct and by speech alike, to leave his attitude in doubt. Little wonder that counsel for the claimant are at one with counsel for the Government in rejecting August, 1891, as the date when occupancy became more than a temporary trespass.

If the date adopted by the Court of Claims is not accepted as the true one, the question is before us, what other shall be substituted? Looking at events in retrospect through the long vista of the years we can see that from the outset the occupancy of the Reservation was intended to be permanent; that, however tortious in its origin, it has been permanent in fact; and that the Government of the United States through the action and inaction of its executive and legislative departments for half a century of time, has ratified the wrong, adopting the *de facto* appropriation by relation as of the date of its beginning. To see the facts in true perspective we must view them in their totality and not in isolation. There are the reports at the beginning as to the purpose of the settlement; the words and the silence of administrative officers when entreated to banish the intruders; the creation of schools for the education of their youth as for that of the youth already there (Report of Commissioner of Indian Affairs, 1879, p. 169); and most important of all, the statutes already summarized, recognizing the Arapahoes equally with the Shoshones as occupants of the land, accepting their deeds of cession, assigning to the tribes equally the privilege of new allotments, and devoting to the two equally the award of future benefits. What meaning can be ascribed to all these cumulative tokens of intention unless it be that the intruders have been confirmed in their occupancy as of the date of the intrusion? Cf. *United States* v. *Creek*

*Nation,* 295 U. S. 103, 110. The Shoshones might protest, as they did, that in setting their hands to the agreement, they did not assent to the violation of treaty stipulations. They might reserve as much as they pleased claims, present and past, for the recovery of damages. Whatever their provisos, the outstanding fact remained that for good or for ill, the Arapahoes were to dwell upon the soil along with them. "The adoption by the United States of the wrongful act of any officer is of course an adoption of the act when and as committed, and causes such act of the officer to be, in virtue of the statute, a rightful appropriation by the Government, for which compensation is provided." *Crozier* v. *Krupp,* 224 U. S. 290, 305.

Confusion is likely to result from speaking of the wrong to the Shoshones as a destruction of their title. Title in the strict sense was always in the United States, though the Shoshones had the treaty right of occupancy with all its beneficial incidents. *United States* v. *Creek Nation, supra,* p. 109. What those incidents are, it is needless to consider now. Cf. *United States* v. *Cook,* 19 Wall. 591; *Pine River Logging Co.* v. *United States,* 186 U. S. 279; *United States* v. *Paine Lumber Co.,* 206 U. S. 467. The right of occupancy is the primary one to which the incidents attach, and division of the right with strangers is an appropriation of the land *pro tanto,* in substance, if not in form.

*Third.* The claimant's damages include such additional amount beyond the value of its property rights when taken by the Government as may be necessary to the award of just compensation, the increment to be measured either by interest on the value or by such other standard as may be suitable in the light of all the circumstances.

The fact is unimportant that the taking was tortious in its origin, if it was made lawful by relation. *Crozier*

v. *Krupp, supra.* The fact also is unimportant that it was a partial taking only, and that eviction was not complete. *Jacobs* v. *United States,* 290 U. S. 13, 16; *United States* v. *Cress,* 243 U. S. 316, 327–330; *Hurley* v. *Kincaid,* 285 U. S. 95, 104. Finally the fact is unimportant, there having been an appropriation of property within the meaning of the Fifth Amendment, that the jurisdictional act is silent as to an award of interest or any substitute therefor. *United States* v. *Creek Nation, supra,* pp. 110, 111. Cf. *Yankton Sioux Tribe* v. *United States,* 272 U. S. 351, 359. Given such a taking, the right to interest or a fair equivalent, attaches itself automatically to the right to an award of damages. *Jacobs* v. *United States, supra; Phelps* v. *United States,* 274 U. S. 341; *Brooks-Scanlon Corp.* v. *United States,* 265 U. S. 106, 123; *Seaboard Air Line Co.* v. *United States,* 261 U. S. 299, 306. These cases distinguish *United States* v. *North American Co.,* 253 U. S. 330, cited by the Government which "rested upon its special facts." *Jacobs* v. *United States, supra.* Nor does the nature of the right divested avail to modify the rule. Power to control and manage the property and affairs of Indians in good faith for their betterment and welfare may be exerted in many ways and at times even in derogation of the provisions of a treaty. *Lone Wolf* v. *Hitchcock,* 187 U. S. 553, 564, 565, 566. The power does not extend so far as to enable the Government "to give the tribal lands to others, or to appropriate them to its own purposes, without rendering, or assuming an obligation to render, just compensation . . .; for that 'would not be an exercise of guardianship, but an act of confiscation.'" *United States* v. *Creek Nation, supra,* p. 110; citing *Lane* v. *Pueblo of Santa Rosa,* 249 U. S. 110, 113; *Cherokee Nation* v. *Hitchcock,* 187 U. S. 294, 307–308. The right of the Indians to the occupancy of the lands pledged to them, may be one of occupancy only, but it is "as sacred as that of the United States to the fee."

*United States* v. *Cook, supra*, p. 593; *Lone Wolf* v. *Hitch-cock, supra; Choate* v. *Trapp*, 224 U. S. 665, 671; *Yankton Sioux Tribe* v. *United States, supra.* Spoliation is not management.

The judgment should be reversed and the cause remanded to the Court of Claims for further proceedings in accord with this opinion.

*Reversed.*

MR. JUSTICE STONE took no part in the consideration or decision of this case.