**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 5 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

---

CITIZEN BAND POTAWATOMI
INDIAN TRIBE OF OKLAHOMA,

    Plaintiff-Appellee,

v.

L. W. COLLIER, in his official
capacity as the area Director of the
Anadarko Area Office of the Bureau
of Indian Affairs, Department of the
Interior,

    Defendant,

and

ABSENTEE SHAWNEE TRIBE OF
OKLAHOMA,

    Defendant-Appellant.

No. 96-6219

---

Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. CIV-92-2161-R)

---

F. Browning Pipestem (Dena L. Silliman, with him on the briefs), of F. Browning
Pipestem & Associates, Norman, Oklahoma, for Defendant-Appellant.

Michael Minnis (David McCullough, with him on the brief), of Michael Minnis & Associates, P.C., Oklahoma City, Oklahoma, for Plaintiff-Appellee.

---

Before **SEYMOUR**, Chief Judge, **LOGAN**, Senior Circuit Judge, and **MURPHY**, Circuit Judge.

---

**SEYMOUR**, Chief Judge.

The Citizen Band Potawatomi Indian Tribe of Oklahoma (Potawatomi Tribe) brought this action against L.W. Collier, an area director for the Bureau of Indian Affairs (BIA), seeking a declaration that the BIA is required to obtain the Tribe's consent before placing into trust land within the boundaries of the former Potawatomi reservation. The lawsuit was precipitated when the Absentee Shawnee Tribe of Oklahoma (Absentee Shawnee Tribe) applied to the BIA to place such land in trust and the BIA informed the Potawatomi Tribe that its consent was not required under the relevant statute and regulations. In a thorough and well-reasoned opinion, the district court granted the Potawatomi Tribe's motion for summary judgment, holding that a prior ruling on the matter by the Interior Board of Indian Appeals (IBIA) for the Absentee Shawnee Tribe was contrary to law. The Absentee Shawnee Tribe, an intervenor below, appeals and we affirm.[1]

# I

The governing statute provides in relevant part:

> The Secretary of the Interior is hereby authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations,

---

[1] The government filed an appeal which was subsequently dismissed on the government's motion before appellate briefing.

including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.

25 U.S.C. § 465.  The regulations governing the acquisition of trust land under the above statute provide as follows:

> Unless another definition is required by the act of Congress authorizing a particular trust acquisition, *Indian reservation* means that area of land over which the tribe is recognized by the United States as having governmental jurisdiction, except that, in the State of Oklahoma . . . , *Indian reservation* means that area of land constituting the former reservation of the tribe as defined by the Secretary.

25 C.F.R. § 151.2(f) (1997).  The regulations further provide:

> An individual Indian or tribe may acquire land in trust status on a reservation other than its own only when the governing body of the tribe having jurisdiction over such reservation consents in writing to the acquisition; provided, that such consent shall not be required if the individual Indian or the tribe already owns an undivided trust or restricted interest in the parcel of land to be acquired.

Id. § 151.8.

In the district court, the BIA asserted that the Potawatomi Tribe's consent was not required under section 151.8 because it shared the former reservation with the Absentee Shawnee Tribe.  On appeal, the Absentee Shawnee Tribe likewise contends that section 151.8 does not apply because it has historically shared the reservation with the Potawatomi Tribe, and that the reservation should therefore be considered that of the Absentee Shawnee as well as that of the Potawatomi.  This appeal therefore requires an assessment of the status of the

land that comprises the former reservation vis-a-vis the two tribes, as revealed by the relevant treaty, statutes, and prior proceedings. We begin our review with a description of the legal history of the land at issue.

The land initially gained reservation status in 1867 pursuant to a treaty between the United States and the Potawatomi Tribe. The treaty recites that its purpose was to secure a home for the Tribe, which was being removed from the state of Kansas to what was to become the state of Oklahoma. See Treaty with the Potawatomi, Feb. 27, 1867, 15 Stat. 531. The Tribe and a government commission were to visit the area to select a suitable location, "and if such location shall be found satisfactory to the Pottawatomies, and approved by the Secretary of the Interior, such tract of land, not exceeding thirty miles square, shall be set apart as a reservation for the exclusive use and occupancy of that tribe." Id. art. 1. It nonetheless appears undisputed that individual Absentee Shawnees, who had separated from the Shawnee Nation, had already settled on a portion of the tract selected as the Potawatomi reservation. The Absentee Shawnees petitioned the President to grant them title to the land on which they had settled. Although the Potawatomi Tribe agreed not to disturb the Absentee Shawnees, it in turn requested that the Potawatomi reservation be extended

westward to include an area equivalent to that occupied by the Absentee Shawnees.[2]

Apparently in response to this situation, an Act was passed in 1872 authorizing the allotment of land within the Potawatomi reservation to each member of the Potawatomi Tribe, and to those Absentee Shawnee Indians who had been residing therein. See Act of May 23, 1872, ch. 206, 17 Stat. 159. The Act provided that "allotments of land lying within the thirty-mile square tract heretofore selected for the Pottawatomie Indians, . . . shall be made to each member of the Pottawatomie band, known as the Pottawatomie citizen band," and further stated that "they may enforce the laws and usages heretofore enforced among them as an Indian tribe, . . . and shall be entitled to equitable representation in the general territorial council, and subject to general laws which it may legally enact." Id. § 1, at 159-60. The Act also provided for allotments to "any Indian of pure or mixed blood of the Absentee Shawnees," who was either a head of a family or over twenty-one years of age, had resided continuously within the reservation for three years, and had made substantial improvements to the land. Id. § 2, at 160. No Absentee Shawnee Indians and only a handful of

---

[2] These background facts are taken from a decision of the Indian Claims Commission, The Citizen Band of Potawatomi Indians of Okla. v. United States, 6 I.C.C. 646 (Sept. 18, 1958), which we discuss infra. The findings were recited by the IBIA in its ruling and are essentially undisputed.

Potawatomi Tribe members received allotments under the 1872 Act, although both Absentee Shawnees and Potawatomi Tribe members continued to reside on the reservation. The Potawatomi Tribe has continuously maintained that the land was reserved to the Tribe under the 1867 Treaty and that the Absentee Shawnees were there only with the Tribe's permission.

In 1887, Congress passed the General Allotment Act, 25 U.S.C. § 331. The Secretary of the Interior determined that the Act applied to the reservation and authorized allotments of land within the reservation to both Potawatomi Tribe members and Absentee Shawnees. Allotments were thereafter made to members of both groups.

The government entered into an agreement with the Potawatomi Tribe on June 25, 1890, and with the Absentee Shawnees the next day, under which the reservation was ceded to the government. In 1891, an Act was passed setting out those agreements. See Act of Mar. 3, 1891, ch. 543, 26 Stat. 989, 1016-22. The Act provided that the Potawatomi Tribe "hereby cede, relinquish, and forever and absolutely surrender to the United States all their claim, title and interest of every kind and character in and to" the Potawatomi reservation. Id. § 8, Art. I, at 1016. As consideration for the relinquishment, the Act further provided that the "United States will pay to said Citizen Band of Pottawatomie Indians" $160,000. Id. § 8, Art. IV, at 1018. With respect to the Absentee Shawnee Indians, the Act

embodied the agreement entered into between "Commissioners on the part of the United States and the Absentee Shawnees residing on what is commonly known as the Pottawatomie Reservation." Id. § 9, at 1019. The Act provided that the Absentee Shawnees likewise relinquished their claim to any interest in the reservation, id. § 9, Art. I, at 1019, and agreed to provide as consideration the payment of $65, 000 to be distributed per capita to allottee Absentee Shawnees on the reservation for their homes and other improvements on their allotments, id. § 9, Art. IV, at 1020-21. Finally, the Act conferred jurisdiction upon the Court of Claims to hear and determine all claims the Potawatomi Tribe might have against the United States arising from the preceding events. Id. § 12, at 1021. There was no similar provision for the Absentee Shawnees.

Years later, the Potawatomi Tribe filed a claim against the United States with the Indian Claims Commission (ICC) to recover additional compensation for the surplus lands in the former reservation, that is, those lands left in the reservation after allotments had been made to the individual members of the Potawatomi Tribe. The government contended that the Tribe was not entitled to compensation for that portion of the reservation occupied by the Absentee Shawnees because the Tribe had consented and agreed that the Absentee

Shawnees could remain on the land.[3]  The ICC rejected this contention as

unsupported.

> We do not find any evidence in the record of any consent or waiver
> on the part of the Citizen Band to a tract of land containing less than
> 900 square miles.  That the Citizen Band did not waive its claim of
> ownership of the lands occupied by the Shawnee is evidenced by the
> Band's willingness to have their west boundary extended sufficiently
> to add an equivalent area of land to that occupied by the Shawnees
> within the 900 square mile tract that had been approved for the
> Citizen Band by the Government, if the Government desired to let the
> Shawnee remain permanently on the Oklahoma Reservation tract.
> (Finding 9).
> It is undisputed that the Absentee Shawnee's possession of
> such Oklahoma lands were not "locations made for them" by the
> Government.  They were, as defendant [the government] states, "in
> the nature of squatters" (Def. Br. p. 9) whose possession was neither
> from time immemorial nor was their possession of lands within the
> Oklahoma Reservation obtained under any color of title or
> recognition of ownership by the Congress or the exclusive
> [executive] branch of the Government or by the Citizen Band.
> (Finding 8)
> The agreement of June 26, 1890, (26 Stat. 1019) wherein the
> Absentee Shawnees ceded the entire Oklahoma Reservation for a
> consideration of $65,000 and confirmation of their allotments cannot
> be construed as a ratification of a "reservation title" or of a use and
> occupancy title from time immemorial.  Their possessory right was in

---

[3] The government also defended on the ground that a patent to the
reservation was never issued to the Potawatomi Tribe because the Tribe never
paid the agreed consideration and therefore had no compensable interest in the
reservation.  The ICC rejected this argument, holding that the United States
received the proceeds from the Tribe's sale of its lands in Kansas before the move
pursuant to the 1867 Treaty, and that the government had held these funds in trust
for the Tribe.  The ICC held that the government's failure, if any, to pay over
these funds as consideration for the purchase of the reservation at issue could not
be charged to the Tribe.  See The Citizen Band of Potawatomi Indians of Okla., 6
I.C.C. at 661-63.

the nature of a tenancy at will; they were in "peaceable possession" after the arrival of the Citizen Band only because the Citizen Band expressed a willingness not to disturb them provided the Government extended the Citizen Band's reservation to include an equivalent area westward. (Finding 8)

The Citizen Band of Potawatomi Indians of Okla. v. United States, 6 I.C.C. 646, 663-65 (Sept. 18, 1958).

## II

In 1992, the Potawatomi Tribe received information leading it to believe that the Absentee Shawnee Tribe had applied to the BIA to take into trust lands lying within the former Potawatomi reservation. Accordingly, the Potawatomi Tribe asked the BIA if any such applications were pending. In a letter to the Tribe dated September 17, 1992, Mr. Collier, for the BIA, refused to confirm or deny the existence of Absentee Shawnee applications. Nonetheless, and notwithstanding the ICC opinion quoted above, Mr. Collier set out the BIA's view that the two Tribes shared a common former reservation area and that the consent of the Potawatomi Tribe was therefore not a necessary predicate to placing that land into trust status under the statute and regulations set out in Part I supra. In support of the BIA's position Mr. Collier relied on the 1872 Allotment Act which, as discussed above, authorized the allotment both to members of the Potawatomi

Tribe and to Absentee Shawnees of "land lying within the thirty-mile square tract heretofore selected for the Pottawatomie Indians." 17 Stat. at 159.

The Potawatomi Tribe filed suit in federal district court, seeking to prevent the BIA from placing into trust lands lying within the former Potawatomie reservation. The government filed a motion to dismiss for failure to join the Absentee Shawnee Tribe as an indispensable party and for failure to exhaust administrative remedies. The district court ruled that the Absentee Shawnee Tribe was an indispensable party and dismissed the action on that ground. The Potawatomi Tribe appealed and this court reversed. See Citizen Band Potawatomi Indian Tribe of Okla. v. Collier, 17 F.3d 1292 (10th Cir. 1994). We held that, standing alone, Mr. Collier's September 17 letter stating the BIA's position on the matter was insufficient to satisfy the BIA's burden of demonstrating the Absentee Shawnee Tribe's interest in the former reservation. Id. at 1293-94. We also rejected as "irrelevant" the 1872 Act upon which the BIA relied, pointing out the Act

> does not create any "undivided trust or restricted interest" of the Absentee-Shawnee tribe in the Potawatomi tribe's land for purposes of 25 C.F.R. § 151.8. It merely grants the Secretary of the Interior the power to allot land to *individual* Absentee-Shawnee tribesmen. The Act does not mention any power to allot lands to the Absentee-Shawnee collectively as a *tribe*.

Id. at 1294.

On remand, the government renewed its motion to dismiss for failure to exhaust administrative remedies, and the district court directed the Potawatomi Tribe to pursue administrative relief, if available. Upon instructions from the BIA, the Tribe appealed Mr. Collier's position letter to the IBIA, which issued an opinion affirming Mr. Collier's decision. See Citizen Band Potawatomi Indian Tribe of Okla. v. Anadarko Area Director, Bureau of Indian Affairs, 28 IBIA 169 (Sept. 12, 1995). The IBIA held that it was bound by the ICC's decision that the Potawatomi Tribe owned the entire reservation as of June 25, 1890. The IBIA concluded, however, that because the ICC opinion determined the ownership of the reservation lands only as of that date, the ICC opinion was not determinative of rights in the land arising thereafter. The IBIA supported its conclusion by referring to Shoshone Tribe of Indians of the Wind River Reservation in Wyo. v. United States, 299 U.S. 476 (1937), which the IBIA described as bearing a resemblance to the history of the Potawatomi reservation. The IBIA also concluded that this court's ruling in the first appeal did not preclude consideration of the merits because we had considered only whether the Absentee Shawnee Tribe was an indispensable party. The IBIA then determined that the language and the legislative history of the 1891 Act, when considered together with Shoshone Tribe, "support a conclusion that Congress intended to recognize some

-12-

rights of the Absentee Shawnees in the Potawatomi Reservation." 28 IBIA at 183.

The Potawatomi Tribe filed an amended complaint in district court alleging that the IBIA decision was entitled to no deference because it was contrary to law, and was arbitrary, capricious, and an abuse of discretion in any event. The Tribe accordingly renewed its motion for summary judgment on those grounds. The BIA filed a cross-motion for summary judgment, and the Absentee Shawnee Tribe was allowed to intervene.

The district court granted summary judgment for the Potawatomi Tribe. The court agreed with the IBIA that the ICC decision determined ownership rights only as of June 25, 1890 and held that defendant Mr. Collier was thus precluded from asserting that the Absentee Shawnee Tribe had an interest in the reservation prior to that time. Rejecting the government's argument that the ICC did not have jurisdiction to decide the matter, the court pointed out that the issue of ownership as of June 25, 1890, had already been litigated in the ICC proceeding where the government argued that the Absentee Shawnees had an ownership interest in the reservation to avoid paying compensation to the Potawatomi Tribe for at least that portion of the reservation occupied by the Absentee Shawnees. The resolution of the issue was therefore necessary to the judgment rendered by the ICC. The court further ruled that, because the United States was a fiduciary or trustee for the

-13-

Absentee Shawnee Tribe, the Tribe was in privity with and represented by the government in the ICC proceedings, and is likewise bound by that decision and precluded from relitigating its ownership interest in the reservation prior to June 25, 1890.

In addressing the merits, the district court reviewed the events leading up to the June 25 agreement and the 1891 Act, and found nothing to indicate that a reservation had been created or recognized for the Absentee Shawnees. The court held:

> [I]t is anomalous to suggest that by the 1891 Act, Congress at once created or recognized a reservation in favor of the [Absentee Shawnee] Tribe while agreeing to confirm allotments made to individual members of the Tribe and accept relinquishment or whatever claim, title or interest the Tribe had in the remainder of the land, which must have necessarily comprised the reservation then being created or recognized.

App., vol. III, at 867. Pointing to its holding that in view of the ICC opinion the Absentee Shawnee Tribe had no interest in the reservation before June 25, 1890,[4] and to the lack of any evidence that Congress or the executive branch created a reservation for the Tribe after that date and before the 1891 Act, the court viewed the Absentee Shawnees' agreement to relinquish any interest in the reservation as

---

[4] In so doing, the court noted that even if the ICC ruling were not given preclusive effect, the well-settled rule that Congressional intent to abrogate treaty rights must be clear and plain would require a finding that the 1867 Treaty granting the Potawatomi Tribe the exclusive right to the land had not been abrogated. App., vol. III, at 868.

-14-

a quit claim deed. The court found additional support for its conclusion in the legislative history of the 1891 Act, which stated that the Absentee Shawnees were on the land selected for the Potawatomi Tribe under the 1867 Treaty "'not . . . by any treaty or Executive order, but the Government has long known of their presence there.'" Id. at 869 (quoting H.R. Rep. No. 51-3481, at 2-3 (1891)). Finally, the court pointed to the definition of a "reservation" set out in the Indian Reorganization Act, 25 U.S.C. § 461, which the court viewed as implicitly defining a reservation as land "'created or set apart by treaty or agreement with the Indians, Act of Congress, Executive order, purchase or otherwise.'" App., vol. III, at 872 (quoting 25 U.S.C. § 461). Because the record contained no evidence that land within the Potawatomi reservation had been set apart for the Absentee Shawnee Tribe within the language of section 461, the court ruled that "[a]t best the 1891 Act confirms an agreement with the [Absentee Shawnee] Tribe to make allotments to individual [Absentee Shawnee] members." Id. at 873. Accordingly, the court held that the IBIA opinion was contrary to clear legislative intent.

On appeal, the Absentee Shawnee Tribe contends the district court failed to afford the IBIA decision proper deference, arguing that the agency's decision was

well-reasoned and factually supported.[5] The Tribe also asserts the earlier ICC decision is not binding on it because it was not a party or in privity with a party to that proceeding, and because the ICC lacked jurisdiction to decide the matter of tribal rights in the former reservation. Finally, the Tribe contends that if anyone is barred by the ICC proceeding, it is the Potawatomi Tribe.

The Absentee Shawnee Tribe does not challenge on appeal the IBIA determination that it is bound by the ICC's holding that the Potawatomi Tribe had exclusive ownership of the reservation as of June 25, 1890. Indeed, the Absentee Shawnee Tribe has maintained throughout this appeal that the issue is whether the Tribe had recognized rights in the Potawatomi reservation arising *after* June 25, 1890. Because the ICC opinion by its terms addresses only the status of the reservation *as of* that date, it could have no binding effect as to ownership of the land thereafter in any event, which is the issue the Tribe contends is dispositive here. Accordingly, we need not address whether the ICC had jurisdiction to determine the ownership of the reservation, or whether its opinion is binding on the government and/or the Tribe.[6] We therefore turn to the Tribe's argument that

_____

[5] The Absentee Shawnee Tribe also asserts that the district court improperly granted summary judgment because the record contains material issues of fact. We disagree. The historical facts are essentially undisputed and have been recited by both the ICC and the IBIA, as well as by the parties and the district court. It is not the facts which are in dispute, but their legal significance.

[6] The Absentee Shawnee Tribe's assertion that the Potawatomi Tribe is

(continued...)

-16-

the district court erred in ruling that the IBIA decision is contrary to law and in holding, contrary to the IBIA, that the Tribe did not obtain rights in the Potawatomi reservation between June 25, 1890, and the passage of the 1891 Act.

## III

We begin by considering the Absentee Shawnee Tribe's assertion that the district court erred in failing to accord the IBIA decision proper deference. Courts must, of course, defer to an agency's delegated authority to interpret by regulation the statute that it administers. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843-44 (1984). Nonetheless, "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." Id. at 843 n.9. "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." Id.

---

[6](...continued)
estopped by the ICC decision from pursuing the relief it requests in this action is without merit. The bar upon which the Absentee Shawnee Tribe relies is found at 25 U.S.C. § 70u, and provides that payment of a claim bars further demands against the United States arising from the controversy. The Potawatomi Tribe is not seeking additional compensation here and the bar thus does not apply.

Although we are to give deference to an agency's construction of the statute it is entrusted to administer, here we are not concerned solely with construing the Secretary's discretion to place reservation land in trust under 25 U.S.C. § 465. The question before us on appeal is whether we must defer to the IBIA's decision that the Absentee Shawnee Tribe had a cognizable interest in the Potawatomi reservation after June 25, 1890. This assessment, in turn, requires that we decide whether the IBIA's determination is contrary to Congressional intent. Accordingly, we must ascertain the intent of Congress in passing the 1891 Act, which embodies the agreements under which the reservation was ceded to the government. Because determining the status of the land at issue thus requires construing the 1891 Act, a statute that is not one Congress gave the agency discretion to administer, there is considerable force to the Potawatomi Tribe's argument that Chevron deference is not appropriate. Cf. Adams Fruit Co. v. Barrett, 494 U.S. 638, 649-50 (1990). We need not decide the issue, however, because upon applying the traditional principles of statutory construction regarding treaty abrogation, we conclude that the IBIA's interpretation is clearly contrary to Congressional intent and thus not entitled to Chevron deference in any event.[7]

---

[7] The IBIA likewise addressed the nature of the BIA's determination of the former reservation status of the Potawatomi reservation, and the degree of

(continued...)

-18-

The Treaty creating the Potawatomi reservation set the land apart "for the exclusive use and occupancy" of the Potawatomi Tribe. See Treaty with the Potawatomi, supra, art. I. The IBIA concluded that the Potawatomi Tribe's treaty right to the exclusive use of the land was abrogated by the agreement between the Absentee Shawnees and the federal government embodied in the 1891 Act. The district court disagreed, holding that neither the language of the Act nor the circumstances surrounding its passage indicated a Congressional intent to abrogate the Potawatomi Tribe's pre-existing ownership rights.

"Congress has the power to abrogate Indians' treaty rights, though we usually insist that Congress clearly express its intent to do so." South Dakota v.

---

[7](...continued)
deference to be accorded that determination on review by the IBIA. See Citizen Band Potawatomi Tribe of Okla. v. Anadarko Area Director, Bureau of Indian Affairs, 28 IBIA 169, 176-78 (Sept. 12, 1995). The IBIA observed that it had previously recognized "the need for legal and historical underpinnings for BIA's definitions of former reservations under [25 C.F.R. § 151.2(f)]." Id. at 177-78. Accordingly the IBIA concluded that "the better view is that BIA's determination concerning former reservation status is a legal conclusion subject to de novo review by the [IBIA]." Id. at 178. We agree with the IBIA's characterization of the determination as a legal one requiring de novo review of its legal and historical bases. Moreover, the IBIA has acknowledged that
> the Secretary does not, by "defining" a former reservation under 25 C.F.R. 151.2(f), purport to proclaim or create a true reservation or to vest the defined area with the attributes of reservation status for jurisdictional purposes. Rather, the Secretary simply describes areas with respect to which the reservation-based provisions of 25 C.F.R. Part 151 will apply.

Id. at 177 n.11.

Bourland, 508 U.S. 679, 687 (1993) (citations omitted). "Congressional intent to abrogate treaty rights will not be lightly inferred; such purpose must be 'clear and plain.'" Oyler v. Allenbrand, 23 F.3d 292, 296 (10th Cir. 1994) (quoting United States v. Dion, 476 U.S. 734, 738 (1986)). Accordingly, we must first examine the language of the Act itself to determine whether it contains a sufficiently clear expression of an intent to abrogate the Potawatomi Tribe's exclusive rights in the land by granting rights to the Absentee Shawnees.

In the Act, both the Potawatomi Tribe and the Absentee Shawnees, in virtually identical language, ceded their interest in the land comprising the Potawatomi reservation. See 26 Stat. at 1016-17, 1019. The Act also provided that the United States would pay sums of money to both tribes for the relinquishment of their interests. See id. at 1018, 1020. These provisions are not an unambiguous expression of an intent to abrogate the Potawatomi Tribe's pre-existing treaty rights to the land. The language is at least as consistent with Congressional intent to receive a quit claim deed from the Absentee Shawnees as with an intent to recognize or create a legitimate claim of ownership rights. Indeed, we agree with the district court that it is most logical to view the above provisions as conveying a quit claim deed rather than as simultaneously granting and taking back an ownership interest.

Our view is reinforced by the difference in treatment accorded the Potawatomi Tribe and the Absentee Shawnees elsewhere in the Act. The Act addressed the 1867 Treaty, and provided that if the Potawatomi Tribe had paid the government for the reservation land in accordance with the Treaty provisions and the government had retained the funds, the government would pay that sum to the Tribe. See 26 Stat. at 1021. The Act also conferred jurisdiction on the Court of Claims to hear and determine the question of payment for the reservation, as well as all questions between the Potawatomi Tribe and the government relative to the Tribe's accounts under various treaties. See id. These provisions, which are addressed to the Potawatomi Tribe and not to the Absentee Shawnees, clearly recognize the Potawatomi Tribe's exclusive reservation rights and are inconsistent with the creation of any such rights in the Absentee Shawnees.

Our view is confirmed by the legislative history of the Act, which states that "[t]he said Citizen Band of Pottawatomie Indians are now, and for more than twenty years have been, occupying a reservation in the Indian Territory . . . about 30 miles square, and containing an area of 575,870.42 acres. This tract was selected by said Indians under the provisions of the treaty of 1867 . . . ." H.R. Rep. No. 51-3481, at 1 (1891). Significantly, the Report describes the Absentee Shawnees as follows:

> As to the Absentee Shawnees, it seems that some time about 1840 they left the main band then located upon the Shawnee

> Reservation in Kansas, and after roaming and hunting for some time settled down upon some of the country embraced within the limits of [the Potawatomi] reservation, where they have remained ever since. *They were not there by any treaty or Executive order,* but the Government has long known of their presence there.

Id. at 2-3 (emphasis added). This description unambiguously reveals that Congress did not view the Absentee Shawnees as having rights in the Potawatomi reservation, and it is hardly clear evidence of Congressional intent to create such rights by passage of the Act.

Nonetheless, the IBIA construed the 1891 Act and its legislative history as evincing an intent to create reservation rights in the Absentee Shawnee, relying on the opinion in Shoshone Tribe of Indians, 299 U.S. 476, which the IBIA viewed as addressing analogous factual circumstances. However, the historical facts upon which that decision was based are distinguishable in critical respects from those before us and the case is therefore inapposite. In Shoshone Tribe, the Tribe sued the United States for breach of a treaty granting the Tribe absolute and undisturbed use of reservation land. The Tribe alleged that this right had been breached when the federal government brought a band of Northern Arapahoes onto the reservation under military escort, established schools for their children, irrigated their ranches, and indicated "their equality of right and privilege" "[i]n numberless other ways." Id. at 488. The Court held that the Commissioner of Indian Affairs and Congress had acted "on the assumption that the occupancy of

-22-

the Arapahoes, initiated, as we have seen, under military escort, was permanent and rightful." Id. at 489. Accordingly, the Court concluded that the Arapahoes obtained equal rights in the reservation as of the time they were placed there under military escort. Id. at 495-96.

The affirmative acts by the government that the Court found compelling in Shoshone Tribe are the very factors missing in the instant case. At most, the circumstances surrounding the 1891 Act reveal that Congress was aware of the Absentee Shawnees' presence on land that had been set aside by treaty for the exclusive use of the Potawatomi Tribe. Absent any affirmative actions indicating an intent to legitimize that presence, however, mere knowledge is simply not sufficient to abrogate the treaty rights granted the Potawatomi Tribe. Moreover, the Court in Shoshone Tribe concluded that the government's conduct from the outset of the Arapahoes' occupancy indicated a Congressional intent to recognize their claim of rights in the reservation as of that time. See id. at 495. Here, to the contrary, the ICC ruled that the government's conduct up until July 25, 1890, did not establish such a claim of right on behalf of the Absentee Shawnees. We find no support for the IBIA decision in Shoshone Tribe.

In sum, we conclude that the language, legislative history, and historical circumstances of the 1891 Act do not evince a sufficiently clear Congressional intent to abrogate the Potawatomi Tribe's treaty right to the exclusive use and

-23-

occupancy of its former reservation. The Secretary is therefore required under its own regulations to obtain the consent of the Potawatomi Tribe before acquiring such land in trust for the Absentee Shawnee Tribe.

The judgment of the district court is **AFFIRMED.**