The **SHOSHONE INDIAN TRIBE OF THE WIND RIVER RESERVATION, WYOMING, Plaintiff,**

v.

The **UNITED STATES, Defendant.**

The **Arapaho Indian Tribe of the Wind River Reservation, Wyoming, Plaintiff,**

v.

The **United States, Defendant.**

Nos. 458–79 L, 459–79 L.

United States Court of Federal Claims.

June 9, 2003.

Steven D. Gordon, Washington, DC, for the Shoshone Indian Tribe. Lynn E. Calkins and Maria Whitehorn Votsch, Washington, DC, John C. Shumacher, Fort Washakie, WY, and Jerome L. Levine and James K. Kawahara, Los Angeles, CA, of counsel.

Richard M. Berley, Seattle, WA, for the Arapaho Indian Tribe. Brian W. Chestnut, Seattle, WA, of counsel.

Elise B. Kappler, with whom were Thomas L. Sansonetti, Assistant Attorney General, U.S. Department of Justice, Washington, DC, for defendant. Thomas Bartman and Faith M. Luchesi, Washington, DC, of counsel.

## OPINION

HEWITT, Judge.

Before the court is defendant's Motion to Dismiss Plaintiffs' Claim of Breach by Defendant's Failure to "Maximize" the Tribes' Oil and Gas Revenues (Def.'s Max.) and a portion of Defendant's Motion for Summary Judgment on Plaintiff[s'] Claims of Breach of Trust on Plaintiffs' Take–or–Pay Claims (Def.'s Take–or–Pay).[1]

### I. Background

This case was filed in 1979 and has been divided into four phases for adjudication.[2]

---

1. Further to the court's April 8, 2003 Order, in this opinion the court will address the entirety of defendant's Motion to Dismiss Plaintiffs' Claim of Breach by Defendant's Failure to "Maximize" the Tribes' Oil and Gas Revenues but only that part of Defendant's Motion for Summary Judgment on Plaintiff[s'] Claims of Breach of Trust on Plaintiffs' Take–or–Pay Claims that addresses the law applicable to that dispute. The remaining issues in Defendant's Motion for Summary Judgment on Plaintiff[s'] Claims of Breach of Trust on Plaintiffs' Take–or–Pay Claims will be addressed following additional briefing to be filed on July 1 and July 15, 2003, and oral argument to be held on July 22, 2003.

2. The facts outlined here include only those relevant to the current issues before the court. A more complete historical background can be found in the court's earlier opinions. *See Shoshone Indian Tribe of the Wind River Reservation, Wyo., v. United States,* 51 Fed.Cl. 60 (2001) (deciding statute of limitations issue); *Shoshone Indian Tribe of the Wind River Reservation, Wyo., v. United States,* 52 Fed.Cl. 614 (2002) (deciding pre-trial motions regarding claims for management of the Tribes' sand and gravel); *see also*

Court's Order of June 13, 2001. The current phase involves plaintiffs' claims of breach of fiduciary duty by the Minerals Management Service (MMS) and its predecessors in the management and payment of royalties. Def.'s Max. at 4; Tribes' Brief Identifying the Issues to be Resolved at Trial of Oil and Gas Phase One (Pls.' Issues Brief) at 2. This opinion addresses the statutory and regulatory framework pursuant to which the Tribes receive royalties for the oil and gas extracted from their land and the interpretation of a 1989 settlement agreement between several oil companies regarding oil and gas extraction (the Arco settlement).

The statutory framework at issue here includes the Act of August 21, 1916 (1916 Act), which authorized the Secretary of the Interior (Secretary) to lease for oil and gas production certain lands ceded from the Wind River Reservation " 'under such terms and conditions as shall be by him prescribed .... ' " Def.'s Max. at 4–5 (quoting 1916 Act, Pub.L. No. 218, 39 Stat. 519).[3] The Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a–396g (IMLA) was later passed to further govern the leasing of land on Indian reservations for oil and gas mining. Def.'s Max. at 5 (citing IMLA). In 1982, the Federal Oil and Gas Royalty Management Act, 30 U.S.C. §§ 1701–1757 (FOGRMA) was passed to provide greater legislative guidance on the valuation of the oil and gas as to which royalties were owed the Tribes. Tribes' Opposition to Defendant's Motion to Dismiss the Tribes' Claims of Breach by Defendant's Failure to Maximize the Tribes' Oil and Gas Revenues (Pls.' Max. Opp.) at 11–12 (citing FOGRMA).

Based on this statutory framework, regulations were promulgated by both the Bureau of Indian Affairs (BIA), found in title 25 of the Code of Federal Regulations (C.F.R.), and the MMS, found in title 30 of the C.F.R.[4]

Def.'s Max. at 5. The text of these rules remained substantially consistent until 1988, when the MMS rewrote its royalty valuation rules, Def.'s Max. at 7 (citing 30 C.F.R. § 206.102(b) (1988) (crude oil), § 206.152(b) (1988) (unprocessed gas), and § 206.153(b) (1988) (processed gas)), and 1996 when the BIA rules were amended to reference the MMS rules for the establishment of the valuation of oil and gas for royalty purposes. Def.'s Max. at 6 (citing 25 C.F.R. § 211.41 (1996)).

The Arco settlement was an agreement reached between Atlantic Richfield Company, Arco Oil and Gas Company, and Arco Natural Gas Marketing, Inc. (collectively, Arco), as lessee/producer, and MDU Resources Group, Inc. and Williston Basin Interstate Pipeline Company (collectively, MDU), as purchaser, on October 17, 1989 in settlement of a case pending in the 95th District Court of Dallas County, Texas, captioned *Atl. Richfield Co. v. MDU Res. Group.* Pls.' Issues Brief at 16. Under the terms of the Arco settlement, MDU paid Arco $39 million. Arco paid royalties to plaintiffs on 53% of this amount. *Id.* at 16–17. Plaintiffs claim that Arco attributed 47% of the settlement amount to "Take–or–Pay at Sec. 107 Pricing."[5] *Id.* at 17. Arco did not pay royalties on this portion of the settlement on the grounds that royalties were not due under 30 C.F.R. § 206 (1988). *See id.* at 19.

The "Take–or–Pay" portion referred to a provision in most long-term gas sales contracts. Def.'s Take–or–Pay at 6. This provision "obligated the purchaser to take a specified minimum volume of gas during an identified period or to pay for that quantity even if not taken in full." *Id.* The dispute here, as was the case in other litigation in

---

*Shoshone Tribe of Indians v. United States,* 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360 (1937) (providing history of the joint occupancy by the Tribes of the Wind River Reservation).

**3.** Facts cited to the briefing or proposed findings of uncontroverted fact of only one of the parties do not appear to be in dispute.

**4.** The Title 25 regulations were first promulgated in 1957. Def.'s Max. at 5. The Title 30 regulations were first promulgated in 1942. Tribes'

Second Supplemental Brief Addressing the Applicability of the Supreme Court's Decision in *United States v. Navajo Nation* (Pls.' Second Supp.) at 4.

**5.** "Take–or–Pay payments are payments for minerals of which the purchaser has opted not to take delivery but for which the purchaser must still pay under the terms of a purchase contract. ..." Pls.' Issues Brief at 17 n. 10.

the 1980s,[6] is whether the settlement amount allocated for gas not actually produced, but due under the terms of the contract, was royalty-bearing or not.

On January 3, 2003, plaintiffs filed the Tribes' Brief Identifying the Issues to be Resolved at Trial of Oil and Gas Phase One. (Pls.' Issues Brief). In response, defendant filed on January 31, 2003 several motions to dismiss or for summary judgment.[7] At an April 7, 2003 status conference, the court decided to take up the issues presented by these motions in two phases. *See* Transcript of Status Conference held on April 7, 2003 (4/7/03 Tr.) at 4–5. This opinion deals with the first phase. At the status conference, the court also requested additional briefing on the impact of *United States v. Navajo Nation*, 537 U.S. 488, 123 S.Ct. 1079, 155 L.Ed.2d 60 (2003), on the issues to be decided in this opinion. 4/7/03 Tr. at 24–28. Both parties supplied this additional briefing. Tribes' Supplemental Brief Addressing the Applicability of the Supreme Court's Decision in *United States v. Navajo Nation* (Pls.' Supp.); Reply to Plaintiffs' Supplemental Brief Addressing Applicability of *Navajo* Decision (Def.'s Supp.).

As to plaintiffs' "maximization" claim, defendant relies primarily on the decision of the Supreme Court in *Navajo Nation* and, particularly, the Court's holding that there was no general fiduciary duty to "maximize" the profits of Indian Tribes absent statutory, regulatory, or contractual obligations. Reply to Opposition to Defendant's Motion to Dismiss Plaintiffs' Claim to Entitlement to "Maximization" of Their Revenue (Def.'s Max. Reply) at 2–5. Defendant argues that there is an absence here of any statute or regulation which requires the government to "maximize" plaintiffs' royalty income. Def.'s Max. at 12–21. Defendant further argues that because plaintiffs have not identified any duty that has been breached by the government's alleged failure to "maximize" profits

from the Tribes' oil and gas leases, the court is without jurisdiction to hear this case. Def.'s Max. at 9–12.

Plaintiffs contend that the regulations and statutory authority governing defendant's management of the Tribes' oil and gas establish a fiduciary duty of the government. Pls.' Max. Opp. at 3–5. Plaintiffs further argues that defendant has breached its duty established by the IMLA and subsequent regulations in failing to ensure that the Tribes' received full value for their oil and gas. *Id.* at 6–11. Plaintiffs argue that the specific statutory and regulatory language here makes this case distinguishable from *Navajo Nation*, and therefore no precedent precludes the Tribes' recovery. Pls.' Supp. at 3–12.

As to plaintiffs' Take–or–Pay claim, defendant argues that under the applicable law and precedents, the Take–or–Pay portions of the Arco settlement at issue are not royalty-producing. Def.'s Take–or–Pay at 12–15. While defendant acknowledges an obligation under various leases to pay royalties at certain percentage rates, it argues that the leases do not define what oil and gas shall be subject to the obligation to pay royalties. *Id.* That subject, according to defendant, is governed by the regulations which are in effect when the royalties are due. *Id.*

Plaintiffs counter that defendant seeks to apply retroactively current regulations but that the regulations that were in effect when the lease was entered into should govern. Tribes' Opposition to Defendant's Motion for Summary Judgment on Plaintiffs' Claims of Breach of Trust on Plaintiffs' Take–or–Pay Claims (Pls.' Take–or–Pay Opp.) at 5–9. Plaintiffs argue that the agency's interpretation at the time the leases were entered into was what was relied upon by the parties, and that to allow the agency to change the rules now would punish the Tribes by binding them into long-term leases that can be al-

---

**6.** *See, e.g., Diamond Shamrock Exploration Co. v. Hodel*, 853 F.2d 1159 (5th Cir.1988).

**7.** In addition to the two motions before the court today, defendant also filed Defendant's Motion for Summary Judgment as to Various Claimed Breaches in MMS Royalty Payment Processing,

Responses to Plaintiffs' Issues Brief where Dispositive Motions are Precluded by Plaintiffs' Failure to Specify its Claims, and Motion to Dismiss Plaintiffs' Claim of Breach Regarding Oil and Gas Resources in Riverbeds. The court will address those after the conclusion of discovery.

tered at any time at the whim of defendant. *Id.* at 9–14.

For the following reasons, defendant's Motion to Dismiss Plaintiffs' Claim of Breach by Defendant's Failure to "Maximize" the Tribes' Oil and Gas Revenues is DENIED IN PART and GRANTED IN PART and Defendant's Motion for Summary Judgment on Plaintiff[s'] Claims of Breach of Trust on Plaintiffs' Take–or–Pay Claims is GRANTED IN PART.

## II.  Discussion

### A.  Motion to Dismiss on Duty to "Maximize" Profits

Rule 12(b)(6) of the Court of Federal Claims (RCFC) governs dismissal for "failure to state a claim upon which relief can be granted." RCFC 12(b)(6). Under RCFC 12(b)(6), the court must accept as true the facts alleged in the complaint, *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 633, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999), and must construe all reasonable inferences in favor of the non-movant, *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed.Cir. 2001). A court must grant the motion "when the facts asserted by plaintiff do not entitle him to a legal remedy." *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed.Cir.2000). RCFC 12(b)(6) specifically instructs that where such a motion is filed and "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided by RCFC 56." RCFC 12(b)(6); *see also Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1250 (Fed. Cir.2000). Matters of contract interpretation are appropriate for summary judgment. *Textron Def. Sys. v. Widnall*, 143 F.3d 1465, 1468 (Fed.Cir.1998).

▇▇ Defendant relies primarily on two cases in support of its argument that the government has no duty to "maximize" the Tribes' oil and gas revenue, *Pawnee v. United States*, 830 F.2d 187 (Fed.Cir.1987), *cert. denied* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988), and *Navajo Nation*. In *Pawnee*, Indian tribes brought suit under the Indian Long–Term Leasing Act, 25 U.S.C. § 396, claiming that the government "breached a fiduciary obligation to provide that plaintiffs received royalty based on 'the highest price paid or offered for like quality gas.'" Def.'s Max. at 14 (quoting *Pawnee*, 830 F.2d at 191). Defendant argues that while the court in *Pawnee* found that the United States has a general fiduciary obligation as to the management of oil and gas leases, the existence of a "'general fiduciary relationship does *not* mean that any and every claim by the Indian lessor necessarily states a proper claim for breach of trust ....'" *Id.* (quoting *Pawnee*, 830 F.2d at 191). Defendant urges close attention to the particular standards and responsibilities imposed by the statutory and regulatory scheme. Defendant relies on the following language from *Pawnee*:

> [T]he fiduciary relationship springs from the statutes and regulations which "define the contours of the United States' fiduciary responsibilities." *Mitchell II,* [ ] 463 U.S. at 224[, 103 S.Ct. 2961]. Where, as in this case, the regulations and the leases deal directly with the problem and are not challenged, the Indians cannot demand that the United States ignore those provisions or act contrary to them. The scope and extent of the fiduciary relationship, with respect to this particular matter, is established by the regulation and leases. Appellants cannot create a viable fiduciary claim purely by insisting that this court (or the Claims Court) establish different or higher standards.

830 F.2d at 192, *see* Def.'s Max. at 14–15. Defendant argues that plaintiffs' maximization claims are effectively the same as the *Pawnee* plaintiffs' claims for "the highest price paid or offered for like quantity gas." Def.'s Max. at 14–15. Because the "valuation regulations applicable to production from tribal leases are identical to the regulations applicable to allotted leases that were involved in *Pawnee*," that case is controlling and plaintiffs' claim must be dismissed. *Id.* at 15.

Defendant also relies on *Navajo Nation* to support its position that the applicable statutes and regulations do not create a duty to "maximize" plaintiffs' profits. Defendant re-

lies on the Supreme Court's statement in *Navajo Nation* that:

> neither the IMLA nor any of its regulations establishes anything more than a bare minimum royalty. Hence, there is no textual basis for concluding that the Secretary's approval function includes a duty, enforceable in an action for money damages, to ensure a higher rate of return for the Tribe concerned. Similarly, no pertinent statutory or regulatory provisions requires the Secretary, on pain of damages, to conduct an independent "economic analysis" of the reasonableness of the royalty to which a Tribe and third party have agreed.

123 S.Ct. at 1094, *see* Def.'s Max. Reply at 4. According to defendant, *Navajo Nation* "sets the bar that plaintiffs must reach to show a duty on defendant's part to 'maximize' their revenues: they must identify specific statutory and regulatory provisions which establish such duties." *Id.* at 4–5.

When the maximization issue was posed at oral argument after supplementary briefing on the impact of *Navajo Nation*, plaintiffs conceded that they could not maintain a claim for "maximization." Transcript of Oral Argument heard on May 14, 2003 (5/14/03 Tr.) at 47–48.[8] Plaintiffs now focus their argument on the existence of a money-mandating statutory and regulatory framework. *See* Pls.' Supp. at 6–12. Specifically, plaintiffs point to the detailed statutory and regulatory framework applicable to oil and gas leasing, a framework not present in the coal leasing regime considered in *Navajo Nation*. *See id.* at 5–6.

Because of the specific language of the oil and gas leasing regime, plaintiffs argue that this case is more akin to *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell II*), where the Court found a money-mandating fiduciary obligation, than to *Navajo Nation*. *See* Pls.' Supp. at 8–12. Under both the timber regu-

lations considered in *Mitchell II* and the oil and gas regulations applicable here, the government has control over advertising and bidding of sales and leases of the Tribes' resources. *Id.* (comparing 25 C.F.R. §§ 141.8, 141.9 (1979) (timber) with 25 C.F.R. § 211.20 (1982), 25 C.F.R. § 184.4 (1957), and 25 C.F.R. § 227.4 (1982) (oil and gas)). Both sets of regulations require the Secretary to establish guidelines for sales and to approve all contracts and leases. *Id.* (comparing 25 C.F.R. §§ 141.13, 141.7 (1979) (timber) with 25 C.F.R. §§ 211.2, 211.3 (1988) (oil and gas)). The Secretary must also closely supervise the lease during contract performance under both sets of regulations. *Id.* (comparing 25 C.F.R. §§ 141.13, 141.7 (1979) (timber) with 25 C.F.R. §§ 211.2, 211.3 (1988) (oil and gas)).

Plaintiffs also point to the fact that in *Navajo Nation*, " 'no pertinent statutory or regulatory provision requires the Secretary, on pain of damages, to conduct an independent "economic analysis" of the reasonableness of the royalty to which a Tribe and third party have agreed,' " *id.* at 10 (quoting *Navajo Nation*, 123 S.Ct. at 1094), while the oil and gas regulations here require the Secretary to conduct an economic analysis:

> The Secretary shall prepare or cause to be prepared an economic assessment that shall address, among other things: [w]hether the production royalties or other form of return on mineral resources is adequate; and [w]hether the minerals agreement is likely to provide the Indian mineral owner with a return on the production comparable to what the owner might otherwise obtain through competitive bidding, when such a comparison can reasonably be made.

*Id.* (citing 25 C.F.R. § 225.23(b)-(c) (1994)).

The oil and gas regulations also differentiate between sales made at arm's length or otherwise. *Id.* at 11–12. For sales made at arm's length, "the value of the product for

---

8. Mr. Gordon: What the court in Pawnee held was that you don't have a claim if you're saying you didn't get us the highest market value—

   . . . .

   — because that's unless you can show that there's a regulation that requires highest mar-

ket value, and there isn't. And it is not our claim—the Government keeps attacking a straw man when it says we're seeking some sort of maximization that is untethered to the [regulations] here.

5/14/03 Tr. at 47.

purposes of computing royalties would be the 'gross proceeds' of the sale." *Id.* at 11 (citing 30 C.F.R. § 206.102 (1988), 30 C.F.R. § 206.52 (1996)). If the sale was not at arm's length, "a series of specified benchmarks would be used to determine value." *Id.* at 11–12 (citing 30 C.F.R. § 206.152 (1988), 30 C.F.R. § 206.172 (1996)). The oil and gas regulations also "provide for the use of dual accounting to value gas produced under non-arm's length contracts." *Id.* at 12 (citing Revision of Gas Royalty Valuation Regulations and Related Topics, 53 Fed.Reg. 1230, 1246 (Jan. 15, 1988)).

Defendant counters that the regulatory language merely vests the Secretary with the "discretion" to conduct an economic analysis in this case. Def.'s Max. Reply at 11–12. Plaintiffs argue, however, that "the existence of 'discretion' in carrying out statutory or regulatory duties does not make the Government immune from suit." Pls.' Supp. at 13. Accordingly, "[t]he Government's failure to consider any factor contemplated by a specific statutory or regulatory provision can give rise to a breach of trust claim." *Id.* at 13–14. Further, the Secretary's exercise of that discretion is limited by the regulations and defendant's fiduciary responsibilities. *See id.* at 15–16. Therefore, plaintiffs argue that defendant " 'cannot escape [its] . . . role as trustee by donning the mantle of administrator' to claim that courts must defer to [its] . . . expertise and delegated authority." *Id.* at 13 (quoting *Cobell v. Norton,* 240 F.3d 1081, 1099 (D.C.Cir.2001) (quoting *Jicarilla Apache Tribe v. Supron Energy Corp.,* 728 F.2d 1555, 1567 (10th Cir.1984))).

In *Navajo Nation,* the Supreme Court clearly outlined what was needed for a Tribe to state a claim cognizable under the Indian Tucker Act:

> [A] Tribe must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties. *See* [*Mitchell II,*] 463 U.S., at 216–217, 219[, 103 S.Ct. 2961]. If that threshold is passed, the court must then determine whether the relevant source of substantive law "can fairly be interpreted as mandating compensation for

damages sustained as a result of a breach of the duties [the governing law] imposes." *Id.,* at 219[, 103 S.Ct. 2961]. Although "the undisputed existence of a general trust relationship between the United States and the Indian people" can "reinforce" the conclusion that the relevant statute or regulation imposes fiduciary duties, *id.,* at 219[, 103 S.Ct. 2961], that relationship alone is insufficient to support jurisdiction under the Indian Tucker Act. Instead, the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions. Those prescriptions need not, however, expressly provide for money damages; the availability of such damages may be inferred.

123 S.Ct. at 1091 (alteration in original). In applying this analytical framework, the Court found that the "statute and regulations [governing coal royalties] . . . do not provide the requisite 'substantive law' that 'mandat[es] compensation by the Federal Government.' " *Id.* (quoting *Mitchell II,* 463 U.S. at 218, 103 S.Ct. 2961) (second alteration in original). In reaching its conclusion, the Court compared the facts of the case before it to the facts present in two earlier Supreme Court cases, *Mitchell II* (finding liability for a claim based on timber regulations), and *United States v. Mitchell,* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (*Mitchell I*) (finding no liability for a claim based on the Indian General Allotment Act of 1887, 25 U.S.C. § 331). *Navajo Nation,* 123 S.Ct. at 1092.

In *Navajo Nation,* the Court considered a situation where, in the course of setting a royalty rate for coal extracted from Tribal land, the Secretary engaged in ex parte communications to the detriment of the Tribe. *See Navajo Nation,* 123 S.Ct. at 1085–88. While the IMLA, one of the statutes applicable in this case, was the statute governing the setting of royalties for coal extracted from Tribal lands, the Court explicitly stated that it was ruling

> only on the Government's role in the coal leasing process under IMLA. . . . [B]oth the IMLA and its implementing regulations address oil and gas leases in considerably more detail than coal leases. Whether the Secretary has fiduciary or

other obligations, enforceable in an action for money damages, with respect to oil and gas leases is not before us.

*Id.* at 1092 n. 11. Based on the statutory and regulatory language that applied to coal royalties, the Court found that the facts of the case before it were distinguishable from those before the Court in *Mitchell II:*

> Unlike the "elaborate" provisions before the Court in *Mitchell II,* 463 U.S. at 225[, 103 S.Ct. 2961], the IMLA and its regulations do not "give the Federal Government full responsibility to manage Indian resources ... for the benefit of the Indians," *id.* at 224[, 103 S.Ct. 2961]. The Secretary is neither assigned a comprehensive managerial role nor, at the time relevant here, expressly invested with responsibility to secure "the needs and best interests of the Indian owner and his heirs."

*Navajo Nation,* 123 S.Ct. at 1092 (quoting *Mitchell II,* 463 U.S. at 224, 103 S.Ct. 2961 (quoting 25 U.S.C. § 406(a))).

The Court found that the facts of *Navajo Nation* more closely resembled the facts in *Mitchell I.* 123 S.Ct. at 1092. *Mitchell I* involved "the role provided for the Government by the GAA [General Allotment Act of 1887] regarding allotted forest lands." *Id.* (citing *Mitchell I,* 445 U.S. at 540–41, 100 S.Ct. 1349).

> Although the GAA required the Government to hold allotted land "in trust for the sole use and benefit of the Indian to whom such allotment shall have been made," [445 U.S.] at 541[, 100 S.Ct. 1349] (quoting 25 U.S.C. § 348), that Act did not "authorize, much less require, the Government to manage timber resources for the benefit of Indian allottees," *Mitchell I,* 445 U.S. at 545[, 100 S.Ct. 1349]. Similarly here, the

IMLA and its regulations do not assign to the Secretary managerial control over coal leasing. Nor do they even establish the "limited trust relationship," *id.* at 542[, 100 S.Ct. 1349], existing under the GAA; no provision of the IMLA or its regulations contains *any* trust language with respect to coal leasing.

*Navajo Nation,* 123 S.Ct. at 1092. Further, like the GAA, which "was designed so that 'the allottee, and not the United States, ... [would] manage the land,'" *id.* (quoting *Mitchell I,* 445 U.S. at 543, 100 S.Ct. 1349) (alteration in original), the IMLA "aims to enhance tribal self-determination by giving Tribes, not the Government, the lead role in negotiating mining leases with third parties." *Id.* (citing 25 U.S.C. § 396a); *see also BHP Minerals Int'l, Inc.,* 139 I.B.L.A. 269, 311 (1997).

In light of the analysis of the Supreme Court in *Navajo Nation,* the court finds that the facts of this case are closer to *Mitchell II* than *Mitchell I.* Initially, the court notes that this case involves oil and gas leases, so there is a much more elaborate statutory and regulatory framework than the coal leasing regime involved in *Navajo Nation. See Navajo Nation,* 123 S.Ct. at 1092 n. 11. Also, the dispute here involves the setting of "value" upon which the rate of royalty was to be paid, and therefore is more closely involved with the statutory and regulatory framework than the ex parte communications complained of in *Navajo Nation.*

Valuation in this case is the subject of two statutory frameworks; the IMLA, 25 U.S.C. §§ 396a–396g, and FOGRMA, 30 U.S.C. §§ 1701–1757. The regulations applicable to this case, promulgated under the IMLA and FOGRMA,[9] specifically addressed valuation

---

9. At oral argument, the court inquired as to what set of statutes and regulations specifically governed this case in each portion of the relevant time period from 1973 to 2000. 5/14/03 Tr. at 60. The parties were unable to state definitively which framework(s) applied for which dates. *See* 5/14/03 Tr. at 61–64. The parties do appear to agree, however, that either or both of IMLA and FOGRMA and their related regulatory frameworks apply thoughout the relevant time period. *See* Tribes' Second Supplemental Brief Addressing the Applicability of the Supreme Court's Decision in *United States v. Navajo* (Pls.'

Second Supp.); Defendant's Shoshone/Arapaho—"Maximization" Claim: Comparison of Relevant Statutes and Authorities and Gas Contract Settlement ("Take–or–Pay") Claim Charts (Def.'s Second Supp.). The court ordered the parties to produce a joint appendix highlighting which portions of the relevant statutes and regulations apply to the facts of this case during which portions of the relevant time period of 1973 to 2000, *see* court's Order of May 15, 2003, and will use that document in the future as a basis for resolving questions regarding the applicability of the two frameworks. The court does not believe it is

in much greater detail than the regulations at issue in *Navajo Nation*, which merely set a minimum royalty rate. *See Navajo Nation*, 123 S.Ct. at 1093 (citing 25 C.F.R. § 211.15(c) (1985)). Here, the regulations state:

> The value of production, for the purpose of computing royalty, *shall* be the estimated reasonable value of the product as determined by the Associate Director, *due consideration* being given to the highest price paid for a part or a majority of production of like quality in the same field, to the price received by the lessee, to posted prices, and to other relevant matters.

30 C.F.R. § 206.103 (1987) (emphasis added). The lease terms, though "technically" negotiated by the Tribes,[10] reserve for the Secretary the task of valuing the Tribes' oil and gas upon which royalties are paid.[11] *See, e.g.*, Appendix to Tribes' Opposition to Defendant's Motion for Summary Judgment on Plaintiffs' Claims of Breach of Trust on Plaintiffs' Take–or–Pay Claims (Pls.' Take–or–Pay Exh.) 4 at 2.

Plaintiffs argue that even more detailed "benchmarks" were established for determining the value of oil and gas beginning in 1988. Pls.' Supp. at 11–12. The parties agree that the 1988 regulations stated:

> For any Indian leases which provide that the Secretary may consider the highest price paid or offered for a major portion of production (major portion) in determining value for royalty purposes, if data are available to compute a major portion,

MMS [Mineral Management Service] will, where practicable, compare the value determined in accordance with this section with the major portion. The value to be used in determining the value of production, for royalty purposes, shall be the higher of those two values.

Pls.' Second Supp. at 5 (quoting 30 C.F.R. §§ 206.102, 206.152–153 (1988), 206.52, 206.172–173 (1996)); Def.'s Second Supp. at 2 (quoting 30 C.F.R. §§ 206.102(a)(2)(i) (1995) (crude oil), 206.152(a)(3)(i) (unprocessed gas) (recodified 1996) and 25 C.F.R. § 211.41(c) (1998) (cross-referencing regulations in Title 30 of the C.F.R.)).

Plaintiffs also argue that the regulatory framework, taken as a whole, shows that the Secretary exercised a great deal of authority over the leases in question and therefore brings this case squarely within *Mitchell II*:

> After the advertising and bidding is complete, the regulations for both [the timber and oil and gas] industries require the approval of all contracts and leases by the Secretary and establish comprehensive guidelines for sales. *Compare* 25 C.F.R. §§ 141.13, 141.7 (1979) (timber) *with* 25 C.F.R. §§ 211.2, 211.3 (1988) (oil and gas). Under the IMLA and the 1916 Act, all oil and gas leases must be on forms prescribed by the Secretary of the Interior, 25 C.F.R. § 211.30 (1988), and all leases "shall be approved by the Secretary." 25 C.F.R. § 211.2 (1988). The Secretary also has the authority to cancel any lease or fine the

---

necessary to know the precise applicable dates for each regulatory framework at issue to decide the pending motions. *See supra* note 4.

**10.** Under IMLA, the Tribes may lease their land for mining purposes. *See* 25 U.S.C. § 396a. While the Tribes are free to negotiate the royalty rate they will receive, all leases must be on forms provided by the Secretary. *See, e.g.*, Appendix to Tribes' Opposition to Defendant's Motion for Summary Judgment on Plaintiffs' Claims of Breach of Trust on Plaintiffs' Take–or–Pay Claims (Pls.' Take–or–Pay Exh.) 4. These leases explicitly provide for the participation of the government in the lease and provide for, among other things, the length of the lease and applicable law governing the lease. *See, e.g., id.* Therefore, while the Tribes may "technically" negotiate the leases, most terms of the leases are completely out of their control.

**11.** "[V]alue" for the purposes of the lease may, in the discretion of the Secretary of the Interior, be calculated on the basis of the highest price paid or offered ... at the time of production for the major portion of the [oil or gas] produced and sold from where the leased fields are situated.... The actual amount realized by the lessee from the sale of said products may, in the discretion of the Secretary of the Interior, be deemed mere evidence of or conclusive evidence of such value.

Pls.' Second Supp. at 3–4 (quoting 25 C.F.R. § 211.13(a) (1982–96)); Def.'s Second Supp. at 1 (quoting 25 C.F.R. § 211.13 (text unchanged until 1996); 30 C.F.R. § 206.103 (text essentially unchanged until 1988)).

lessee up to $500 per day for each day that a lease is violated. *See* 25 C.F.R. §§ 211.22, 211.27 (1988); *accord* 25 C.F.R. § 184.24 (1957); 25 C.F.R. § 227.24 (1982); 25 C.F.R. §§ 225.36, 225.37 (1994) (penalty up to $1000 per day). This close supervision mirrors the supervision and management of timber resources that were examined by the Court in *Mitchell II* and found sufficient to confer fiduciary obligations on the Government. *See* 463 U.S. at 219–22[, 103 S.Ct. 2961].

Pls.' Supp. at 9. The court also notes that the leases themselves provide for an "oil and gas supervisor," who was the officer designated by the Secretary of the Interior "to supervise oil and gas operations on Indian lands," and a "superintendent," who was the "official in charge of the Indian Agency having jurisdiction over the lands leased." *See, e.g.,* Pls.' Take–or–Pay Exh. 4 at 1.

The court agrees with plaintiffs that this comprehensive valuation framework creates fiduciary responsibilities on the part of the government. This, however, is not the end of the argument; defendant contends that even if this is the case, the Federal Circuit's decision in *Pawnee* and the discretion built into the regulatory framework require that this case be dismissed. The court turns to *Pawnee* first.

In *Pawnee*, the Federal Circuit interpreted a regulatory framework that was virtually identical to the framework in this case. There, the court stated:

> Because the statutes and regulations at issue in this case clearly establish fiduciary obligations of the Government in the management and operation of Indian lands and resources, they can fairly be interpreted as mandating compensation by the Federal Government for damages sustained. Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties.

*Pawnee,* 830 F.2d at 190. However, the court went on to state "[t]hat there is such a general fiduciary relationship does *not* mean that any and every claim by the Indian lessor necessarily states a proper claim for breach

of the trust—a claim which must be fully tried in the Claims Court." *Id.* at 191.

The claim at issue in *Pawnee* involved the Secretary's failure " 'to enable ... [plaintiffs] to receive the benefits of gas *royalties computed upon the market value determined by the highest price paid or offered for like quality gas at the time of production.' " Id.* The *Pawnee* plaintiffs claimed damages as " 'the difference[ ] between the amount actually collected as gas royalties for plaintiffs' benefit and *the amount which should have been collected for plaintiffs' benefit, based upon market value determined by the average of the three highest prices at the time of and in the county where it was produced.' " Id.* The court found that:

> [t]he difficulty with this claim is that it runs counter to the governing regulation and the terms of the leases. The appellants demand royalties based on the highest market price or value at the time and/or place of production, but the governing regulation and the leases expressly restrict the highest price *"for the major portion"* of the gas "produced and sold from the field where the leased lands are situated."

*Id.*

Because appellants in *Pawnee* wanted the Secretary "to go contrary to and beyond the regulations and the leases in order to fulfill its alleged fiduciary obligation to appellants," the court found that appellants had not stated a proper claim for breach of trust based on the statutes and regulations that "define the contours of the United States' fiduciary responsibilities." *Id.* at 191–92. Here, to the extent their claims can be read as a claim for "maximization" barred by *Pawnee,* the Tribes have conceded the point. *See* 5/14/03 Tr. at 47.

However, the Tribes also claim that "[t]he Government failed to collect royalties based on the proper value of oil and gas." Pls.' Issues Brief at 12–13. This proper value can be determined by application of the regulations above. Unlike the plaintiffs in *Pawnee,* in this statement of their claim the Tribes are not asking the Secretary to go "contrary to and beyond the regulations and the leases in order to fulfill its alleged fiduciary obli-

gation to appellants," *Pawnee,* 830 F.2d at 191; rather, plaintiffs are merely asking that the Secretary comply with her own regulations. This is a cognizable claim, and therefore *Pawnee* does not bar the Tribes' claim.

Defendant, relying on *Navajo Nation,* also argues that the discretion afforded the Secretary under the regulations bars the Tribes' claim. *See* Def.'s Max Reply at 11–12. Defendant argues that because "[p]laintiffs have not shown a statute or regulation which makes [economic] analysis mandatory," any alleged failure to perform that analysis cannot form a basis for damages. *Id.* The court, however, agrees with plaintiffs that the discretion afforded the Secretary here is not so wide as to protect defendant from liability.

In the post–1988 regulatory framework, under 30 C.F.R. § 206.102, "if data are available to compute a major portion, MMS *will,* where practicable, compare the value determined in accordance with this section with the major portion." 30 C.F.R. § 206.102(a)(2)(i) (1988) (emphasis added). Defendant argues that the introductory adverbial clause, "if data are available" renders the Secretary's obligation discretionary. 5/14/03 Tr. at 67. The court disagrees. The clause "if data are available" creates a condition precedent affecting certain decisions, but does not render the subsequent decisions discretionary. Nor does the qualifying phrase "where practicable," render the responsibility discretionary. That phrase permits a reasonable determination that, in certain circumstances, a value comparison is not "practicable." The phrase does not make the government's role discretionary.

The pre–1988 regulatory framework mandated that the supervisor give "due consideration" to enumerated factors and directed that the resulting valuation be an "estimated reasonable value:"

> The value of production, for the purpose of computing royalty, *shall be the estimated reasonable value* of the product as determined by the Associate Director, *due consideration* being given to the highest price paid for a part or a majority of production of like quality in the same field, to the price received by the lessee, to posted prices, and to other relevant matters.

30 C.F.R. § 206.103 (1987) (emphasis added). This regulation provides the Secretary with guidelines within which to exercise her discretion, and provides the court with guidelines within which to evaluate the Secretary's action. The court does not agree with the government that the fact that the value is "as determined by the Associate Director" is, in the context of the regulation, an indication that the supervisor's action is entirely discretionary. *See* Def.'s Supp. at 3–4; 5/14/03 Tr. at 50. Such an interpretation would render the balance of the regulation (e.g., the words "shall be the estimated reasonable value") meaningless, a result to be avoided in statutory interpretation. *See* 2A Norman J. Singer, *Sutherland Statutory Construction* § 46.06 at 181–194 (6th ed.2000). The court finds that the discretion afforded the Secretary under the regulations is not so broad as to require the dismissal of this claim. Defendant's Motion to Dismiss Plaintiffs' Claim of Breach by Defendant's Failure to "Maximize" the Tribes' Oil and Gas Revenues is DENIED IN PART as to defendant's failure to collect royalties based on the proper value of oil and gas and GRANTED IN PART as to defendant's failure to "maximize" the Tribes' oil and gas revenues.

**B. Motion for Summary Judgment on Take–or–Pay Claims**

Summary judgment is warranted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact that might significantly affect the outcome of the litigation is material. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Disputes over facts that are not outcome determinative will not preclude the entry of summary judgment. *Id.* at 247–48, 106 S.Ct. 2505.

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to

show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987). The movant is also entitled to summary judgment if the non-movant fails to make a showing sufficient to establish an element of its case on which it will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

■ The Take–or–Pay dispute requires the court to decide whether the portion of the Arco settlement attributable to Take–or–Pay claims is royalty-bearing. Plaintiffs argue that the terms of their leases, properly interpreted, make the Take–or–Pay portion of the settlement royalty-bearing, so that the government's failure to obtain royalties on that portion of the settlement is a breach of its money-mandating trust obligations. Pls.' Issues Brief at 17; Pls.' Supp. at 18–20.

After many years of interpreting the leases to include take-or-pay amounts in the calculation of royalties, Pls.' Take–or–Pay Opp. at 9, the government issued a regulation to that effect in January 1988. Revision of Gas Royalty Valuation Regulations and Related Topics, 53 Fed.Reg. 1230, 1273 (Jan. 15, 1988). The agency's interpretation to include take-or-pay payments in gross proceeds was overturned. *Diamond Shamrock*, 853 F.2d at 1165; *see also Indep. Petroleum Ass'n of America v. Babbitt*, 92 F.3d 1248, 1253 (D.C.Cir.1996) *(IPAA)*. In late 1988, the government issued a regulation excluding take-or-pay payments from the calculation of royalties. Revision of Gross Proceeds Definition in Oil and Gas Valuation Regulations, 53 Fed.Reg. 45082–83 (Nov. 8, 1988) (codified at 30 C.F.R. § 206). The regulation that excluded take-or pay amounts from the cal-

culation of royalties was in effect when the settlement was executed.

Plaintiffs contend that "the meaning of the lease language is determined by reference to the governing law and the contemporaneous construction of the parties when the leases were executed ...." Pls.' Take–or–Pay Opp. at 6. The leases provide that royalties are payable on oil and gas "produced and saved." *See, e.g.*, Pls.' Take–or–Pay Exh. 4 ¶ (c). Plaintiffs acknowledge that "the leases ... are silent as to whether the value of what was 'produced and saved' includes take-or-pay amounts received in relation to those products," and is therefore royalty-bearing. Pls.' Take–or–Pay Opp. at 6. But plaintiffs contend that "the Government had a well-established policy in effect which made it clear that take-or-pay amounts were to be included in calculating royalties." *Id.* at 6–7. Plaintiffs rely on the agency's long-standing interpretation in effect before 1988 that "gross proceeds" included take-or-pay amounts, *id.* at 9, and argue that the application of 1988 regulations excluding take-or-pay amounts from "gross proceeds" was improperly retroactive. Pls.' Take–or–Pay Opp. at 9–10.

Plaintiffs further argue that "it is firmly established that a regulation cannot be retroactively applied absent 'express authorization' from Congress to do so." *Id.* at 12 (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213–14, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988)). The Tribes argue that retroactivity is especially important here, where the regulations governing Indian leases specifically state that "[n]o regulation that becomes effective after the date of approval of any lease or permit shall operate to affect the duration of the lease or permit, rate of royalty, rental, or acreage unless agreed to by all parties to the lease or permit." *Id.* at 13 (quoting 25 C.F.R. § 211.1(b)). "It is not the law that the Tribes are indefinitely locked into the royalty rate set in those leases while the Government is free to alter to the Tribe's detriment the definition of the proceeds upon which the royalty is to be paid." *Id.* at 14.[12]

---

12. Plaintiffs argue that the agency's "long-standing [pre–1988] policy," Pls.' Supp. at 14, is neither arbitrary nor capricious, and that the court should defer to the agency's expertise on this

Even if the 1988 regulation in effect at the time of the settlement could be viewed as detrimental to the Tribes, however, the court finds that the government was entitled to rely on it. Notwithstanding plaintiffs' general statements of the law of property rights, the "retroactive" application of regulations is clearly addressed in the leases. The leases at issue state that the parties will "abide by and conform to any and all regulations of the Secretary of the Interior now or hereafter in force relative to such leases." *See, e.g.,* Pls.' Take–or–Pay Exh. 4 ¶ (g). The only exception to the agreement that regulations "hereinafter in force" will govern the lease is that "no regulation hereafter shall effect a change in rate of royalty or annual rental herein specified without the written consent of the parties to this lease." *Id.* In the court's view the "rate of royalty" is the numerical percentage of value to which plaintiffs are entitled. This view is confirmed by the text of the leases in which the rate of royalty is separately stated as a percentage. *See, e.g.,* Pls.' Take–or–Pay Exh. 4 ¶ (c). The components of "value" are separately addressed in both the leases and the applicable regulations. *See, e.g., id.; see also, e.g.,* 30 C.F.R. § 206.103 (1987). Because the November 1988 regulation was the proper regulation to apply to the settlement under the terms of the lease, the agency was entitled to rely on

it when the agency collected royalties on the Arco settlement.

Therefore, Defendant's Motion for Summary Judgment on Plaintiff[s'] Claims of Breach of Trust on Plaintiffs' Take–or–Pay Claims is GRANTED IN PART.

### III. Conclusion

For the foregoing reasons, defendant's Motion to Dismiss Plaintiffs' Claim of Breach by Defendant's Failure to "Maximize" the Tribes' Oil and Gas Revenues is DENIED IN PART as to defendant's failure to collect royalties based on the proper value of oil and gas and GRANTED IN PART as to defendant's failure to "maximize" the Tribes' oil and gas revenues. Defendant's Motion for Summary Judgment on Plaintiff[s'] Claims of Breach of Trust on Plaintiffs' Take–or–Pay Claims is GRANTED IN PART as to the applicability of the November 1988 regulations to the Arco settlement.

IT IS SO ORDERED.

issue. *Id.* at 20–21. Relying on the dissenting opinion in *IPAA* which states that " 'the law involved in *Diamond Shamrock* is unsettled,' " plaintiffs argue that the court should not overturn the agency's expert interpretation in this case. *Id.* at 21 (quoting *IPAA,* 92 F.3d at 1261 (Rogers, J., dissenting)). By arguing that the agency's long-standing interpretation should have the weight of a prior regulation, plaintiffs are, in effect, contending that *Chevron* deference applies in this case. 5/14/03 Tr. at 27–28; *see generally Chevron U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Supreme Court has stated, however, that *Chevron* deference applies to "a formal adjudication or notice-and-comment rulemaking," not, as is the pre–1988 situation here, interpretations announced in opinion letters, "policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law . . . ." *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000); I Richard Pierce, Jr., *Administrative Law Treatise,* § 3.5 at 152–53 (4th ed.2002). In addition, plaintiffs have not presented any precedent where *Chevron* deference was used to bind

an agency, as is the case here. *See* 5/14/03 Tr. at 28–29. Given the absence of authority for plaintiffs' argument, the court finds that *Chevron* deference does not apply to the agency's pre–1988 interpretation of plaintiffs' leases.

Based on the conclusion that the agency's prior statutory interpretation does not have the effect of law and is not entitled to deference, the court cannot find that the November 1988 regulation conforming to the *Diamond Shamrock* decision was invalidly retroactive. The November 1988 rule was primarily interpretive, in that it conformed the agency's interpretation of the "gross proceeds" rule to *Diamond Shamrock.* *See* Def.'s Take–or–Pay at 7–8; Pls.' Take–or–Pay Opp. at 10–11. Courts have consistently held that interpretive rules can be applied retroactively because they do not impose new duties. I Pierce, *Administrative Law Treatise,* § 6.7 at 367 (citing *Farmers Tel. Co. v. Fed. Communications Comm'n,* 184 F.3d 1241 (10th Cir.1999); *Appalachian States Low–Level Radioactive Waste Comm'n v. O'Leary,* 93 F.3d 103 (3d Cir.1996); *Cowen v. Bank United of Tex.,* 70 F.3d 937 (7th Cir.1995)).